UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

)
MARTHA HART, as personal representative of )
THE ESTATE OF OWEN JAMES HART, )
                  )
           Plaintiff, )
                  )      CIVIL ACTION NO. _____
           v. )
                  )
WORLD WRESTLING ENTERTAINMENT, )
INC., VINCE MCMAHON and )
LINDA MCMAHON )
                  )
          Defendants. )
_____)

## COMPLAINT AND JURY DEMAND

     Plaintiff Martha Hart, as personal representative of the Estate of Owen James Hart

("Estate"), by and through its attorneys, Nixon Peabody LLP, alleges for her Complaint for

Breach of Contract, Unjust Enrichment, Accounting, and Unfair and Deceptive Trade Practices

against Defendants World Wrestling Entertainment, Inc. ("WWE"), Vince McMahon and Linda

E. McMahon as follows:

## NATURE OF THE ACTION

     1.    Plaintiff Martha Hart, the widow of Owen James Hart, sues defendants WWE and

Vince McMahon and Linda McMahon, the WWE's current and/or past owners, officers and

principal decision makers, for their wrongful usurpation of Martha's right, as personal

representative of her husband's estate, to control Owen's likeness, name and celebrity.  Owen

Hart died on May 23, 1999 when he fell from an apparatus approximately 80 feet high into a

wrestling ring before a crowd of 16,500 in a reckless and dangerous stunt that was negligently

planned, orchestrated and directed by the WWE, namely Vince and Linda McMahon.

Defendants insisted that Owen perform the stunt despite knowing he was uncomfortable with such extreme heights and the manner he was to descend and hired grossly inadequate personnel and equipment to enhance the stunt's theatrical effect.  Defendants have engaged in a host of blatantly disrespectful acts in regards to Owen since his death and have never once apologized to Martha or Owen's and her children for their role in causing Owen's death.  For this reason and others, Martha has refused all association of her late husband's image, likeness and name with the WWE, Mr. McMahon or Mrs. McMahon since Owen's death.

2.     Over the last eleven years, Martha has established and grown the Owen Hart Foundation ("Foundation") as a tribute to Owen and his humanitarian passions outside of the wrestling ring.  The Foundation devotes its resources to providing scholarships and housing to "hard-working people who have limited resources and unlimited potential."  Martha began the Foundation with proceeds from her multi million dollar settlement with defendants for Owen's death and has tirelessly pursued the twin goals of fund-raising for, and promoting awareness of, the Foundation through annual events profiling internationally renowned entertainers (including Jerry Seinfeld, Bill Cosby, Bob Newhart, and Ringo Starr).  A key component of the Foundation's strategy and success has been Martha's public and private disassociation of Owen's name and likeness from anything WWE or McMahon related and her outspoken criticism of the WWE and the McMahons.

3.     Since Owen's death, the WWE and McMahons have sought every available opportunity to further exploit Owen's personality for their own commercial benefit.  Their use of Owen's name and likeness draws attention to the WWE's ongoing violent and highly questionable theatrical activities that caused Owen's death.  Defendants' use of Owen's name and likeness is also in direct disregard of Martha's and her children's objections.  Most recently,

the WWE produced and distributed an April 2010 video entitled "Hart & Soul: The Hart Family Anthology" that features Owen's legal name and likeness on its cover, in its content and its web-based sales and promotional materials.  The WWE's wrongful use of Owen's name and likeness, over Martha's continuing objection to any association with defendants and in the absence of any legal right of use, creates the wrongful impression that Martha and the Estate now support, approve or condone the video (which they do not).  Moreover, the WWE's wrongful use of Owen's name and likeness breaches and has breached the Estate's intellectual property rights in Owen's celebrity, breaches and has breached other contracts that existed between Owen and the WWE at the time of his death, and is otherwise inequitable and an unfair and deceptive trade practice under applicable law.

## PARTIES

4.      Plaintiff Martha Hart is the widow and representative of the Estate of Owen James Hart, deceased.  She is a citizen of the province of Calgary, Canada.

5.      Upon information and belief, defendant World Wrestling Entertainment, Inc. ("WWE") is a Delaware corporation with a principal place of business at 1241 East Main Street, Stamford, Connecticut. At all material times, WWE has organized, operated and promoted entertainment featuring professional wrestling personalities under the name "World Wrestling Entertainment."  WWE is the successor to Titan Sports, Inc. ("Titan").

6.      Upon information and belief, defendant Vincent K. McMahon is a natural person and citizen of Connecticut.  Vince McMahon is Chairman and CEO of WWE, and has been, with his wife Linda, the  principal force behind its commercial activities since its inception.

7.      Upon information and belief, defendant Linda E. McMahon is a natural person and citizen of Connecticut.  Linda E. McMahon is the former CEO of WWE, and has been, with

her husband Vince, the principal force behind its commercial activities.  Moreover, she

authorized and signed the primary contract between Owen Hart and the WWE that the WWE has

repeatedly breached.

## JURISDICTION AND VENUE

8.      This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (a)(2)

because the parties are citizens of a state and citizen of a foreign State and the amount in

controversy is in excess of $75,000, exclusive of interest and costs.

9.      Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or

omissions giving rise to the Estate's claims occurred in this judicial district.  In addition, the

underlying contract between Owen Hart and the WWE provides that the claims asserted herein

be brought in this venue.

## FACTS

### THE PARTIES' AGREEMENT

10.     Owen Hart was a highly successful professional wrestler and entertainer, having

performed around the world for 13 years until his tragic death in 1999.

11.     Throughout his wrestling career and in his personal life, Owen was known as  a

humanitarian.  He supported numerous charitable and philanthropic causes and had a reputation

for integrity and compassion that eclipsed his wrestling persona.

12.     On July 1, 1996, Owen, then age 31, signed as a professional wrestler with the

WWE, and the WWE agreed to act as his promoter ("Booking Agreement") (attached hereto at

*Exhibit A*).

13.     Defendant Linda E. McMahon, then the principal officer of the WWE, signed the

Booking Agreement on behalf of Titan Sports, Inc.

14.     Under Section 3.1 of the Booking Agreement, Owen and Titan agreed that "Original Intellectual Property" includes:

> all service marks, trademarks and any and all other distinctive and identifying indicia under which WRESTLER claims any rights, including but not limited to his/her legal name, his/her ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the 'Original Intellectual Property') […]

15.     Although Owen assigned his rights in Original Intellectual Property to Titan and its successors during the term of the Booking Agreement, Titan agreed that control over and the exclusive right to use "Original Intellectual Property" reverted to Owen upon termination of the Booking Agreement.

16.     Titan and Owen agreed that Titan has exclusive rights to "New Intellectual Property," defined under the Booking Agreement at Section 3.2(a)(i) as:

> With the exception of the Original Intellectual Property, service marks, trademarks and/or distinctive and identifying indicia, including ring name, likeness, personality, Character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines, themes, used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment during the term of this Agreement are hereby assigned to and shall belong to PROMOTER in perpetuity with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

17.     New Intellectual Property also includes certain trademarks, service marks, ring names, characters, persona and related intellectual property created by Titan during the term of its earlier contracts with Owen.

18.     Under Sections 7.2 and 7.3 of the Booking Agreement, Owen, and now his Estate, was to receive 25% of the net receipts from licensed commercial products utilizing Owen's Original and/or New Intellectual Property or the pro rata share of 25% of the proceeds of such licensed products when used in conjunction with other talent ("Licensed Product Royalties").

19.     Under Sections 7.5 and 7.6 of the Booking Agreement, Owen, and now his Estate, was to receive 5% of the net receipts from direct sale of commercial products utilizing Owen's Original and/or New Intellectual Property or its pro rata share of 25% of sale proceeds when Owen's Original and/or New Intellectual Property is used in conjunction with other talent ("Direct Sales Royalties").

20.     Under Section 7.8 of the Booking Agreement, Owen, and now his Estate, was to receive 25% of the net receipts from video products utilizing Owen's Original and/or New Intellectual Property or its pro rata share of 25% of such proceeds when Owen's Original and/or New Intellectual Property was used in conjunction with other talent ("Video Royalties").

21.     Titan and Owen agreed that the Booking Agreement would terminate upon Owen's death pursuant to Section 11.2.  Such termination did not, however, end Titan's royalty payment obligation under the Booking Agreement.

<u>OWEN'S TRAGIC DEATH</u>

22.     On May 23, 1999, Owen fell to his death at the Kemper Arena in Kansas City, Missouri, while performing a dangerous and reckless stunt planned, orchestrated and directed by the WWE and Vince and Linda McMahon as part of a pay-per-view wrestling event organized by the WWE.  Defendants required Owen to perform the stunt despite knowing that he disapproved of it, had a fear of such extreme heights and the manner of descent and had almost fallen during a previous descent that the WWE required him to perform.

23.     At the time of his death, Owen was a Canadian citizen and resident of Calgary.

24.     Shortly after Owen's death, Martha Hart, Owen's widow, along with their minor children and Owen's parents, sued Titan, Vince McMahon, Linda McMahon and the manufacturer of stunt apparatus which failed Owen for wrongful death.  The lawsuit alleged that the stunt was dangerous and poorly-planned and that the apparatus chosen for the stunt by the

McMahons was defective and completely inappropriate.  In the suit, Martha and her children, along with Owen's parents, sought to recover damages for Owen's death.

25.     In response to Martha's suit, and in an attempt to intimidate and deter her from pressing her claim, Titan, at Vince and Linda McMahon's direction, counter-sued Martha in Connecticut, claiming that she had breached the Booking Agreement by bringing a wrongful death action against them.  This tactic is entirely consistent with defendants' belief that intimidation, strength and pressure are the appropriate way to run a business and treat business partners.

26.     Notwithstanding Titan's suit against Martha, she was undeterred and persevered in her efforts to obtain compensation for her family and the Hart family for Owen's needless death.  The lawsuits were eventually settled out of court, with Titan paying a multi-million dollar settlement to the Hart family, and dismissing its baseless suit against Martha.  Despite this, defendants have never acknowledged their culpability in Owen's death or so much as apologized to Martha and Owen's children.

### MARTHA CREATES THE OWEN HART FOUNDATION AND TAKES ALL STEPS POSSIBLE TO DISTANCE IT AND OWEN HART'S NAME FROM THE WWE

27.     In December 2000, after settlement of the lawsuit against Titan, Martha established The Owen Hart Foundation ("Foundation").  Its two signature charitable priorities are scholarships and housing.  The Foundation also partners with other worthy causes that share its vision, such as school lunch programs that feed low-income children.  As demonstrated by its mission statement of : "help[ing] hard-working people who have limited resources and unlimited potential," the Foundation is the antithesis of the WWE and McMahons whose only mission is to promote themselves and their organization through theatrical acts of violence and intimidation.

28.     Building this tribute to Owen and his children has given Martha strength and saved her from despair over Owen's death.

29.     The Foundation has experienced tremendous growth and success over its ten year history.  Today, the Foundation is able to attract high profile entertainers such as Ringo Starr, Jerry Seinfeld, Bill Cosby, Howie Mandel and Bob Newhart, who participate in supporting its fund-raising events and celebrating Owen's memory through the Foundation's good works.

30.     Since Owen's death, Martha and Owen's children have steadfastly avoided associating with the WWE or the McMahons because they were responsible for Owen's death and have a public image that is inconsistent with Foundation's good works.  Contrary to the WWE and McMahons, Martha, Owen's children and the Foundation want nothing to do with violent and highly questionable theatrical events.

31.     Martha and Owen's children have also made their distaste for and disapproval of defendants generally known.  Indeed, it is of paramount importance to the Estate that Owen's name and likeness, which are now commonly recognized as representing kindness, tenderness and social responsibility, have no association with the WWE, which is known for encouraging performers to commit an array lewd acts or be perceived by the public as approving or endorsing any WWE event or product.

32.     Since Owen's death, the Estate has worked diligently to suitably memorialize Owen's life, including the 2002 publication of Martha's book, "Broken Harts: the Life and Death of Owen Hart," describing Owen's life and tragic death.  Martha's book prominently featured Owen's name and likeness on its cover and throughout its contents.  Martha donated the proceeds from sales of the book to a charity on behalf of the Foundation.

33.     On August 5, 2002, in association with the publication of the book, the Estate

registered a copyright to the life story of Owen James Hart.

WWE PUBLISHES AN UNAUTHORIZED VIDEO USING OWEN'S
LEGAL NAME AND LIKENESS WITHOUT THE ESTATE'S PERMISSION

34.     Earlier this year, the WWE, at the direction of the McMahons, or to further their

interests, produced a video entitled "Hart & Soul: The Hart Family Anthology" (the "Video")

that purports to chronicle the life of the Hart family, including Owen.

35.     In April 2010, approximately 90,000 copies of the Video were produced of which

52,000 copies shipped to retail stores in the United States, 12,000 shipped to a Canadian

distributor and 20,000 copies remain in inventory for eventual international distribution.

36.     The Video is currently available for sale, including online at websites owned or

controlled by defendants.

37.     The List price of the Video is $34.95.  If all current copies are sold, sales could

reach a total of $3,145,500, exclusive of any additional copies produced to meet additional

demand.

38.     The packaging and promotional materials for the Video display Owen's legal

name and likeness on the exterior of the Video's package.  For instance, on the cover of the

Video, defendants have used Owen's legal name to promote and sensationalize its contents.

39.     The online promotional materials for the Video, including on websites owned or

controlled by defendants, also contain descriptions of the Video that utilize Owen's legal name.

Some of these descriptions also make reference to the circumstances of Owen's death as a

further way to draw attention to the content of the Video.

40.     The Video also contains several pictures of Owen from his childhood and before

he signed any contract with the WWE.

12979284.7

41.     Defendants did not seek or obtain the Estate's consent to use Owen's likeness or legal name or other Original Intellectual Property for promoting or packaging the Video, and have no right to do so without the consent of the Estate.

42.     Defendants' misappropriation of Owen's legal name and likeness in promoting the Video is their blatant attempt to associate Owen with them, profit from his name and likeness and suggest to the world that he and his family approve of defendants violent and morally questionable theatrical events.  Defendants' conduct has resulted in their commercial gain and unjust enrichment, damage to the Estate and serves no public interest.

43.     The release of the Video, with its use of Owen's legal name on the cover and use of his likeness throughout, has caused irreparable harm to the Estate, which exercises strict control over the use of Owen's legal name and image in association with products, services and causes.

44.     The Video has tainted the Foundation's image by creating the false impression that the Estate has now abandoned its longstanding policy of disassociating itself from all matters WWE and McMahon-related.  As a result, defendants have damaged and continue to damage the Foundation's reputation that it has unrelentingly built up for ten years.

### THE ESTATE SUES TO PREVENT RELEASE OF THE VIDEO IN CANADA AND DISCOVERS ADDITIONAL AND REPEATED MISAPPROPRIATIONS OF HART'S NAME AND LIKENESS

45.     Martha and the Estate learned of the release and dissemination of the Video on or around March 20, 2010.

46.     On March 25, 2010, the Estate, through counsel, immediately notified WWE that it had no permission to use Owen's legal name or likeness in connection with the Video; nevertheless, the WWE released the Video for sale.

12979284.7

47.     On March 29, 2010, the Estate initiated legal proceeding against WWE's Canadian affiliates seeking to enjoin distribution of the Video in Canada.

48.     In the Canadian legal proceedings, Martha and the Estate learned for the first time that the WWE at the direction of the McMahon defendants had made many unauthorized commercial uses of Owen's name and likeness in addition to the Video.

49.     During the course of the Canadian action, WWE disclosed that it had routinely violated the Booking Agreement by repeatedly, and without permission of the Estate, displaying Owen's name and likeness in or on, or in connection with:

(a)     at least 37 DVDs released by the WWE, with his name displayed on the packaging of 7 of them;

(b)     multiple segments of  the DVD, "Bret 'the Hit Man' Hart: The Best There is...", including in a chapter to the DVD entitled, "The Death of Owen Hart;"

(c)     WWE television programs;

(d)     WWE website;

(e)     an online subscription service through WWE.com; and

(f)     the "WWE Encyclopedia – The Definitive Guide to World Wrestling Entertainment," in which his picture and/or name appears 7 times.

50.     The Canadian lawsuit was the first time the Estate learned about these violations.

51.     On information and belief, such materials include Owen's Original Intellectual Property.

52.     No Royalty payments have been paid to the Estate on account of any of these commercial product sales.

## COUNT I
## FALSE ASSOCIATION

53.     Plaintiff repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 52 of the Complaint.

54.     The Estate of Owen James Hart retains sole legal right over the name and likeness of Owen James Hart, exclusive of New Intellectual Property.

55.     The Estate has intentionally permitted the Owen Hart Foundation to use Owen James Hart's name and likeness, exclusive of New Intellectual Property, for the furtherance of its charitable works and goals.

56.     The Estate has intentionally refused to associate with defendants or permit defendants to use Owen James Hart's name and likeness or other Original Intellectual Property.

57.     Defendants have not sought or received the Estate's permission for the use of Owen James Hart's name or likeness or other Original Intellectual Property.

58.     Defendants have produced the Video and other goods and promotions that impermissibly appropriate Owen James Hart's name, likeness and other Original Intellectual Property.

59.     Such unauthorized use of Owen James Hart's name and likeness constitutes a false association in violation of the Lanham Act (15 U.S.C. § 1125).

60.     The Video and other goods and promotions have lead to confusion in the marketplace as to the association, sponsorship or approval of the Estate and/or Foundation with the Video and other goods and promotions and defendants.

61.     This confusion has benefitted defendants by impermissibly appropriating the goodwill generated by the Foundation.

62.     This confusion has harmed the Estate by damaging its reputation through impermissibly implying its association with defendants.

**WHEREFORE**, the Estate demands judgment against defendants for damages in an amount to be determined at trial, injunctive relief, together with interest, attorneys' fees, costs and such other relief as the court deems just and appropriate.

## COUNT II
## INVASION OF PRIVACY

63.     The Estate repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 62 of the Complaint.

64.     The Estate of Owen James Hart retains sole legal right and title to the name and likeness of Owen James Hart except as specifically provided in the Booking Agreement.

65.     Defendants have not sought or received the Estate's permission to use Owen James Hart's name and likeness.

66.     Defendants have repeatedly appropriated Owen James Hart's name and likeness beyond their rights in the New Intellectual Property.

67.     The Estate has been harmed by this invasion of privacy.

**WHEREFORE**, the Estate demands judgment against defendants for damages in an amount to be determined at trial, injunctive relief, together with interest, attorneys' fees, costs and such other relief as the court deems just and appropriate.

## COUNT III
## BREACH OF CONTRACT – UNAUTHORIZED USE OF ORIGINAL INTELLECTUAL PROPERTY

68.     The Estate repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 67 of the Complaint.

69.     Pursuant to Section 3.2 (b) of the Booking Agreement, ownership and use of Original Intellectual Property, including Hart's legal name, ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines and themes in which he had rights, reverted to Owen Hart upon the termination of the Booking Agreement.

70.     Pursuant to Section 11.2 of  Booking Agreement, the Agreement was terminated upon the death of the Owen James Hart.

71.     Defendants have used Original Intellectual Property, including in the Video, after ownership reverted to Owen Hart upon the termination of the contract.

72.     The Estate has been damaged by defendants' breach of the obligation not to use the Original Intellectual Property.

**WHEREFORE**, the Estate demands judgment against defendants for damages in an amount to be determined at trial, together with interest, attorneys' fees, costs and such other relief as the court deems just and appropriate.

## COUNT IV
## COPYRIGHT INFRINGEMENT FOR USE OF LIKENESS

73.     The Estate repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 72 of the Complaint.

74.     The Estate of Owen James Hart retains sole legal right, including copyright, over use of the Original Intellectual Property, including the legal name, ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines and themes of Owen James Hart, exclusive of New Intellectual Property.

75.     Defendants have not sought permission for commercial use of the name and likeness of Owen James Hart beyond New Intellectual Property.

76.     Defendants have repeatedly utilized the name and likeness of Owen James Hart, beyond New Intellectual Property, for commercial purposes without express written permission of the Estate.

77.     The Estate has been harmed by this violation of its copyright.

**WHEREFORE**, the Estate demands judgment against defendants for damages to be determined at trial, together with interest, attorneys' fees, costs and such other relief as the court deems just and appropriate.

<u>**COUNT V**</u>
<u>**BREACH OF BOOKING AGREEMENT BY DEFENDANTS --FAILURE TO PAY**</u>
<u>**ROYALTIES**</u>

78.     The Estate repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 77 of the Complaint.

79.     Under Sections 7.2 and 7.3 of the Booking Agreement, the Estate is entitled to 25% of the net receipts from commercial products utilizing Owen's Original and/or New Intellectual Property or its pro rata share of 25% of sale proceeds when Owen's Original and/or New Intellectual Property is utilized in conjunction with other talent ("Royalties").

80.     Under Sections 7.5 and 7.6 of the Booking Agreement, the Estate is entitled to 5% of the net receipts from direct sale commercial products utilizing Owen's Original and/or New Intellectual Property or the pro rata share of 25% of such proceeds when Owen's Original and/or New Intellectual Property is utilized in conjunction with other talent ("Direct Sales Royalties").

81.     Under Sections 7.8 of the Booking Agreement, the Estate is entitled to 25% of the net receipts from video products utilizing Owen's Original and/or New Intellectual Property or the pro rata share of 25% of the proceeds when utilized in conjunction with other talent ("Video Royalties").

82.     As the WWE admitted in a sworn statement filed with the Canadian courts, defendants have repeatedly used the name and likeness of Owen James Hart since 1999 without the Estate's permission.

83.     Defendants have paid the Estate no royalties since 1999 despite an obligation to do so.

84.     The Estate has been damaged by defendants' breach of the obligation to pay Royalties to the Estate.

**WHEREFORE**, the Estate demands judgment against defendants for damages in an amount to be determined at trial, together with interest, attorneys' fees, costs and such other relief as the court deems just and appropriate.

## COUNT VI
## UNJUST ENRICHMENT

85.     The Estate repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 84 of the Complaint.

86.     Since 1997, defendants have been and continue to be obligated to pay plaintiff Royalties pursuant to the Booking Agreement.

87.     Despite their obligation to do so, defendants failed to pay plaintiff royalties due and owing under the Booking Agreement.

88.     Defendant's failure to compensate the Estate constitutes unjust enrichment.

**WHEREFORE**, the Estate demands judgment against defendants for the royalties due and owing under the Booking Agreement, together with interest, attorneys' fees, costs and such other relief as the court deems just and appropriate.

## COUNT VII
## ACCOUNTING

89.     The Estate repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 88 of the Complaint.

90.     Pursuant to Section 7.12(a) of the Booking Agreement, the Estate is entitled to an accounting.

91.     No such accounting has been granted to the Estate.

92.     The calculation of the monetary amounts in this action is based on estimates of defendants' sales and revenue from materials and merchandise that used the name and likeness of Owen James Hart.

93.     The accuracy of this estimate cannot be confirmed without an accounting of the receipts and disbursements, profit and loss statements and other financial materials, statements and books from defendants.

**WHEREFORE**, the Estate demands judgment ordering defendants to account to plaintiff for any and all revenue derived as a result of the marketing, promoting or selling of products that include or reference Owen's Original Intellectual Property.

## COUNT VIII
## VIOLATION OF CUTPA

94.     The Estate repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 93 of the Complaint.

95.     Defendants are engaged in the conduct of trade and commerce in the State of Connecticut within the meaning of C.G.S. § 42-110a et seq.

96.     Defendants have offended public policy as it has been established by common law, statute and otherwise, and violated the Connecticut Unfair Trade Practices Act ("CUTPA"),

§ 42-110b, by willfully and maliciously engaging in unfair methods of competition and unfair and deceptive acts and practices in trade and commerce by misappropriating Owen Hart's life story and Original Intellectual Property, breaching their contractual obligations, and profiting therefrom to the loss and detriment of the Estate.

97.     The Estate has suffered damages and an ascertainable loss as defined by C.G.S. § 42-110g(a).

98.     A copy of this Complaint will be served upon the Attorney General and Commissioner of Consumer Protection in accordance with C.G.S. § 42-110g(c).

**WHEREFORE**, the Estate demands judgment against defendants for damages in an amount to be determined at trial, doubled or trebled where appropriate, its attorney's fees in this matter, interest, costs and such other relief as the court deems just and appropriate.

## COUNT IX
## VIOLATION OF RIGHT OF PUBLICITY

99.     The Estate repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 98 of the Complaint.

100.     The Estate retains sole legal right and title to Owen James Hart's name and likeness except as specifically provided in the Booking Agreement.

101.     Defendants have repeatedly appropriated Owen James Hart's name and likeness beyond their rights in the New Intellectual Property for a commercial purpose and have benefitted commercially from such misappropriation.

102.     Defendants have not sought or received the Estate's permission to use Owen James Hart's name and likeness.

103.     The defendants' use of Owen James Hart's name and likeness is likely to cause damage to the commercial value of his persona.

104.    The Estate has been damaged by this damage in the commercial value to Owen James Hart's persona

**WHEREFORE**, the Estate demands judgment against defendants for damages in an amount to be determined at trial, injunctive relief, together with interest, attorneys' fees, costs and such other relief as the court deems just and appropriate.

Respectfully Submitted,

MARTHA HART, personal representative of THE ESTATE OF OWEN JAMES HART,

By her attorneys,


  /s/ Stacie Boeniger Collier
Stacie Boeniger Collier (CT-18895)
NIXON PEABODY LLP
One Citizens Plaza
Providence, RI 02903
(401) 454-1000
sbcollier@nixonpeabody.com

and

Arthur L. Pressman (pro hac vice pending)
Gregg A. Rubenstein (pro hac vice pending)
Ronaldo Rauseo-Ricupero (pro hac vice pending)
NIXON PEABODY LLP
100 Summer Street
Boston, Massachusetts  02110
(617) 345-1000
apressman@nixonpeabody.com
grubenstein@nixonpeabody.com
rrrauseoricupero@nixonpeabody.com

Dated:  June 22, 2010

## JURY DEMAND

Plaintiff demands a jury trial on all claims so triable.

12979284.7

# EXHIBIT A

## TITAN SPORTS, INC.
## BOOKING CONTRACT

This contract made effective this _1_ day of _JULY (m)_ 1996, is by and between Titan Sports, Inc., a Delaware corporation d/b/a The World Wrestling Federation ("WWF") with its principal place of business at 1241 East Main Street in Stamford, Connecticut (hereinafter referred to as "PROMOTER"), and Owen Hart residing at 2028 Sirocco Drive, S.W., Calgary, Alberta, Canada T3H 2N9 (hereinafter referred to as "WRESTLER").

### PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business of organizing, publicizing, arranging, staging and conducting professional wrestling exhibitions throughout the world and of representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness, personality and character; and

WHEREAS, PROMOTER has established a nationwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions and PROMOTER has established a network of cable television organizations which regularly broadcast PROMOTER's professional wrestling exhibitions on a pay-per-view basis; and in addition thereto, PROMOTER has developed and produced certain other television programs, which are also used to publicize, display and promote PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his/her wrestling services and his/her standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such wrestling exhibitions constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires PROMOTER to arrange wrestling matches for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the premises and of their mutual promises and agreements as herein set forth, the parties intending to be legally bound do hereby agree as follows:

# 1. BOOKING

1.1        WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

(a)        During the term of this Agreement, the right to engage WRESTLER's performance in wrestling matches at professional wrestling exhibitions, as well as appearances of any type at other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler or relating to sports entertainment (collectively the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location (for later viewing or broadcast), or otherwise.

(b)        During the term of this Agreement, the right to sell or otherwise distribute tickets of admission to the general public for viewing any or all of the Events, as well as any closed circuit television, pay-per-view television or other video exhibition of the Events.

(c)        During the term of this Agreement, and thereafter as provided in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of Intellectual Property (as defined hereinbelow) for merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2        In consideration of WRESTLER's grant of rights, license and other services, as hereinafter set forth, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, or is otherwise not in breach of this Agreement, PROMOTER shall endeavor to book WRESTLER in wrestling matches at various Events during the term of this Agreement.

# 2. WORKS

2.1        If PROMOTER books WRESTLER to appear and perform at Events, each such booking shall be a special commission; and WRESTLER hereby grants to PROMOTER and PROMOTER hereby accepts, the exclusive right during the term of this Agreement to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereafter created, WRESTLER's appearance, performance, commentary, and any other work product for any or all of the Events. (These recordings by tape, disc, film, or otherwise are collectively referred to herein as "Programs").

2.2        Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, PROMOTER shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, televise by any form of television (including without limitation, free, cable, pay cable, closed circuit and pay-per-view television), transmit, publish, copy, reconfigure, compile, print, reprint, vend, sell, distribute and use, and to authorize others to do so, the Programs in perpetuity in any manner or media

rev 1/5/96
Draft 6/18/96

and by any art, method or device, now known or hereafter created (including without limitation, by means of videodisc, videocassette, optical, electrical and/or digital compilations, theatrical motion picture and/or non-theatrical motion picture). All gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible property shall be immediately returned to PROMOTER upon termination of this Agreement for any reason.

2.3.     WRESTLER's appearance, performance and work product in any or all of the Events and/or Programs shall be deemed work for hire; and notwithstanding the termination of this Agreement, PROMOTER shall own in perpetuity all Programs and all of the rights, results, products and proceeds in and to, or derived from the Events and Programs (including without limitation, all incidents, dialogue, characters, actions, gags, routines, ideas, titles, inventions, and other material written, composed, submitted, added, improvised, or created by WRESTLER in connection with his/her appearance in the Programs) and PROMOTER may obtain copyright and/or trademark and/or any other legal protection therefor in the name of PROMOTER and/or PROMOTER's designee.

2.4     If PROMOTER directs WRESTLER, either singly or in conjunction with PROMOTER, to create, design or develop any copyrightable work (herein referred to as a "Development"), such direction shall be a special commission and such Development shall be deemed work for hire and PROMOTER shall own such Development. All Programs referred to in this Agreement and Developments are collectively referred to as "Works."

2.5     All Works and WRESTLER's contributions thereto shall belong solely and exclusively to PROMOTER in perpetuity notwithstanding any termination of this Agreement. To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.). In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity, notwithstanding any termination of this Agreement. To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby assigns to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

rev 1/5/96
Draft 6/18/96

# 3. INTELLECTUAL PROPERTY

3.1        The parties agree that as of the date of this Agreement, all service marks, trademarks and any and all other distinctive and identifying indicia under which WRESTLER claims any rights, including but not limited to his/her legal name, his/her ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "Original Intellectual Property") are described on Schedule A attached hereto and made a part hereof. WRESTLER hereby assigns in good faith to PROMOTER and PROMOTER hereby accepts all worldwide right, title and interest in and to the Original Intellectual Property, including, but not limited to the rights to license, reproduce, manipulate, promote, expose, exploit and otherwise use the Original Intellectual Property anywhere in the world in any commercial manner or media and by any art, method or device now known or hereafter discovered.

3.2        (a)      (1)      With the exception of the Original Intellectual Property, any service marks, trademarks and/or distinctive and identifying indicia, including ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines, themes, used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment during the term of this Agreement (collectively the "New Intellectual Property") are hereby assigned to and shall belong to PROMOTER in perpetuity with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

             (ii)      WRESTLER acknowledges that during the period of prior Agreement with PROMOTER, certain trademarks, service marks, ring names, characters, persona and related intellectual property were created, developed and/or maintained by PROMOTER. Such trademarks, service marks, ring names, characters, persona and related intellectual property, whether used alone and/or as part of any tag team, are deemed New Intellectual Property as described in Section 3.2(a)(i).

             (b)      Upon the termination of this Agreement, all rights in and to the Original Intellectual Property shall revert to WRESTLER, except that PROMOTER, its licensees, sublicensees and assigns may continue to exploit materials, goods, merchandise and other items incorporating any Original Intellectual Property made before such termination until all such materials, goods and merchandise are sold off.

3.3        It is the intention of the parties that the New Intellectual Property belongs to PROMOTER in perpetuity, even to the exclusion of WRESTLER, and shall survive the termination of this Agreement for any reason. PROMOTER shall have the exclusive right to assign, license, sublicense, reproduce, promote, expose, exploit and otherwise use the New Intellectual Property in any commercial manner now known or hereinafter discovered, whether during or after the term of this Agreement and notwithstanding termination of this Agreement for any reason.

rev 1/5/96
Draft 6/18/96

3.4      The Original Intellectual Property and the New Intellectual Property are collectively referred to as "Intellectual Property."

3.5      WRESTLER agrees to cooperate fully and in good faith with PROMOTER for the purpose of securing and preserving PROMOTER's rights in and to the Intellectual Property.   In connection herewith, WRESTLER acknowledges and hereby grants to PROMOTER the exclusive worldwide right during the term (with respect to Original Intellectual Property) and in perpetuity (with respect to New Intellectual Property) to apply for and obtain trademarks, service marks, copyright and other registrations throughout the world in PROMOTER's name.   At PROMOTER's expense and request, PROMOTER and WRESTLER shall take such steps as PROMOTER deems necessary for any registration or any litigation or other proceeding, to protect PROMOTER's rights in the Original and/or New Intellectual Property and/or Works.

## 4. MERCHANDISING

4.1      WRESTLER hereby agrees that PROMOTER shall have the exclusive right (i) during the term of this Agreement and thereafter as provided in this Agreement, to use the Original Intellectual Property   and (ii) in perpetuity to use the New  Intellectual Property, in connection with the manufacture, production, reproduction, broadcast, rebroadcast, distribution, sale, and other commercial exploitation of materials, goods, merchandise, and any other items.   As to all such materials, goods, merchandise or items created, developed, produced and/or distributed during the term of this Agreement using the Original Intellectual Property, PROMOTER shall have the right to sell and exploit such materials, goods and merchandise until the sell-off of same.   As to all such materials, goods, merchandise or items using the New Intellectual Property, PROMOTER shall have exclusive right in perpetuity, to sell and exploit same forever.   By way of example and not of limitation, such items include t-shirts, posters, photos, video tapes and video cassettes, dolls, books, biographies, articles and stories, and any other such material goods, merchandise, or items relating to WRESTLER or his/her performance as a professional wrestler.

4.2      It is the intention of the parties that PROMOTER's rights described under Section 4.1 are exclusive to PROMOTER even to the exclusion of WRESTLER. PROMOTER shall own all copyrights and trademarks in any and all such materials, goods, merchandise and items and shall be entitled to obtain copyright, trademark, service mark or other registrations in its own name; and shall provide all reasonable assistance to PROMOTER in so obtaining such copyright trademark, service mark or other registrations.

rev 1/5/96
Draft 6/18/96

## 5. EXCLUSIVITY

5.1       It is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by WRESTLER to PROMOTER are exclusive to PROMOTER even to the exclusion of WRESTLER.

5.2     In the event WRESTLER desires to participate in any commercial activity in which PROMOTER is not otherwise engaged, and WRESTLER's participation in such activity requires use of the Original and/or New Intellectual Property, PROMOTER may at its discretion, upon WRESTLER's written request, execute a sublicense to WRESTLER for the limited purpose of authorizing WRESTLER to participate in such specific commercial activity upon mutually agreeable terms and conditions. PROMOTER's sublicense to WRESTLER shall constitute an exception to Paragraphs 3 and 4 herein, solely with respect to WRESTLER's participation in such specific commercial activity and shall not license, sublicense, authorize, grant or permit any other or further appropriation or infringement of PROMOTER's rights whatsoever.

## 6. TERM AND TERRITORY

6.1       The term of the Agreement shall be five (5) years from the effective date hereof. Thereafter, this Agreement shall automatically renew for successive one (1) year terms, unless either party shall serve written notice to the other party at least ninety (90) days prior to the end of the term of this Agreement of such party's decision to terminate this Agreement as at the end of the term.

Moreover, in the event that at the end of all terms imposed at PROMOTER's option as provided herein, PROMOTER desires to enter into an agreement for any further term, including entering into a standard term Booking Contract, but WRESTLER does not wish to do so because he has received an offer from a competing wrestling/sports entertainment organization or entity, he must indicate the same in his written notice of non-rollover to PROMOTER, and further, not provide or agree to provide professional wrestling services to such other competing wrestling organization or entity without first providing PROMOTER with the opportunity to enter into an agreement for his services on substantially similar terms during the ninety (90) day notice period.

Reference herein to the term hereof means the initial term and any such renewed or extended term. During any such extended term, all rights, duties, obligations, and privileges hereunder shall continue as stated herein. Notwithstanding anything herein to the contrary, termination of this Agreement for any reason shall not affect PROMOTER's ownership of and rights in, including but not limited to, any Works, New Intellectual Property and any registrations thereof, or the rights, results, products, and proceeds in and to and derived from WRESTLER's performance as a professional wrestler during the term of this Agreement; and the exploitation of the rights set forth in Paragraphs 1, 2, 3 and 4 hereof in any and all media now known or hereafter developed.

6.2       The territory of this Agreement shall be the world.

rev 1/5/96
Draft 6/18/96

## 7. PAYMENTS

7.1        (a)        Provided that WRESTLER fulfills all of his obligations and warranties and provided WRESTLER does not breach this Agreement, the total of the payments due WRESTLER for any and all appearances or performances or wrestling services of any type whatsoever rendered to PROMOTER, and for the granting of all rights in and to all Original and/or New Intellectual Property, shall be Two Hundred Fifty Thousand ($250,000.00 US) Dollars for each contract year of this Agreement.

           (b)        WRESTLER acknowledges, understands and agrees that the annual compensation of Two Hundred Fifty Thousand ($250,000.00 US) Dollars for each contract year shall be paid in equal, weekly installments, commencing the first week from which this Agreement has been executed by PROMOTER.

7.2        Further, in the event the Original and/or New Intellectual Property are used by PROMOTER and licensed, sublicensed, or otherwise assigned to third parties for production, reproduction and/or sale and distribution, in conjunction with any materials, goods, merchandise or other items, (hereinafter collectively referred to as "Licensed Products"), such that the applicable Licensed Product only features the Original and/or New Intellectual Property, WRESTLER shall be paid twenty-five percent (25%) of the Licensed Products' Net Receipts received by PROMOTER with respect to any such licensing, sublicensing or assignment.  Licensed Products' Net Receipts means the gross amount received by PROMOTER less expenses incurred by PROMOTER's or its licensing agent for the applicable Licensed Product.

7.3        In the event the Original and/or New Intellectual Property are used by PROMOTER or licensed, sublicensed, or otherwise assigned to third parties in connection with Licensed Products featuring WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate twenty-five (25%) of the Licensed Products Net Receipts, to be paid pro-rata among WRESTLER and all other talent so featured.

7.4        In the event the Original and/or New Intellectual Property are used by PROMOTER or licensed, sublicensed or assigned for non-wrestling personal appearances and performances such as personal appearances for advertising or non-wrestling promotional purposes, radio and television commercials, movies, etc., WRESTLER shall be paid an amount to be mutually agreed to by WRESTLER and by PROMOTER of the "Personal Appearance Net Receipts" received by PROMOTER.  Personal Appearance Net Receipts means the amount received by PROMOTER after payment of and provision for all PROMOTER's costs and expenses, except income taxes.

7.5        In the event PROMOTER, directly or indirectly, distributes and sells any Licensed Products directly through Arena Sales, and/or Mail Order Sales (hereinafter "Direct Sales Products"), such that the applicable product only features the Original and/or New Intellectual Property,

rev 1/5/96
Draft 6/18/96

WRESTLER shall be paid five percent (5%) of the "Direct Sales Products' Net Receipts" derived by PROMOTER from such exploitation. Direct Sales Products' Net Receipts means the gross amount received by PROMOTER for sales of such products sold at Arenas and/or via Mail Order after deduction of local taxes and applicable arena commission(s) allocated for concession sales.

7.6         In the event the Original and/or New Intellectual Property are exploited by PROMOTER such that Direct Sales Products feature WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate five (5%) percent of the Direct Sales Products Net Receipts to be paid pro-rata among WRESTLER and all other talent so featured.

7.7         In the event WRESTLER is a featured performer with other wrestlers represented by PROMOTER in live Events produced and/or used for Pay-Per-View Specials such as "Wrestlemania," "Royal Rumble," "Summerslam," and "Survivor Series" (hereinafter "WWF Video Specials"), PROMOTER shall allocate and prorate twenty-five percent (25%) of the "WWF Video Specials' Net Receipts" paid to PROMOTER among WRESTLER and all other talent, based upon the total amount paid to all talent for their appearance and performance in such live Event.  WWF Video Specials' Net Receipts mean the gross amount received by PROMOTER from its licensees less all costs, if any, incurred by PROMOTER to produce the applicable WWF Video Special.

7.8         In the event WRESTLER is a performer with other wrestlers represented by PROMOTER, in non-pay-per-view video programs (hereinafter "WWF Series"), or a featured video program, PROMOTER shall allocate and prorate twenty-five percent (25%) of the "WWF Series' Net Receipts" paid to PROMOTER from its licensees pro-rata among WRESTLER and all other talent so featured.  WWF Series' Net Receipts mean the gross amount received by PROMOTER from its licensees less expenses, if any, incurred by PROMOTER in connection with production of the applicable WWF Series.

7.9         If PROMOTER instructs WRESTLER to appear and perform in any Events or Programs as a commentator and/or to participate in post-Event production and/or voice-over activities as a commentator, such instruction shall be a special commission and WRESTLER's commentating shall be deemed work-for-hire and WRESTLER hereby assigns to PROMOTER and PROMOTER shall own all rights to all of WRESTLER's commentary and WRESTLER shall not be entitled to receive any royalty payments, or any additional compensation or residual payments whatsoever, as a result of PROMOTER's commercial exploitation of such commentary in any form, whether broadcast programming, cable programming, pay-per-view programming, videotapes, video disks or otherwise.

7.10        It is the understanding of the parties that WRESTLER shall not be paid anything for PROMOTER's exploitation of his/her Original and/or New Intellectual Property in PROMOTER's wrestling magazine known as the WWF Official Magazine, or any of PROMOTER's other magazines or other publications, which PROMOTER may publish, produce or distribute at arenas, at newsstands and/or by mail at newsstands, by mail, or through electronic or any other manner of media or

rev 1/5/96
Draft 6/18/96

distribution including, but not limited to, publication or distribution on the Internet or America On Line.

7.11    All payments made to WRESTLER are in full without withholding of any Federal, state or local income taxes, and/or any social security, FICA or FUTA taxes. After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER.

7.12    PROMOTER shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter, based upon the royalties received and processed by Titan in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

(a) PROMOTER shall maintain books of account related to the payment of royalties hereunder at its principal place of business. WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine and copy PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during PROMOTER's normal business hours and upon reasonable notice. Such audit shall be conducted in a manner that will not unreasonably interfere with PROMOTER's normal business operations. WRESTLER shall not audit PROMOTER's books and records more than twice during any calendar year and no such audit shall be conducted later than six months after the last statement of royalties is given, delivered or sent to WRESTLER. Each audit is limited to thirty (30) days. Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

(b) WRESTLER shall be deemed to have consented to all statements of royalties and all other accountings provided by PROMOTER hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless specific objection in writing, stating the basis thereof, is given by WRESTLER to PROMOTER within one (1) year from the date the royalty statement was given, delivered or sent to WRESTLER.

(c) No claim shall be filed and no suit, action or other litigation proceeding shall be commenced or sustained in a court of law against PROMOTER or PROMOTER'S affiliates that disputes any statement of royalties or accounting given by promoter hereunder; or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within one year after the date such statement or accounting is first given, delivered or sent to WRESTLER.

## 8. PROMOTER'S OBLIGATIONS

rev 1/5/96
Draft 6/18/96

8.1        Although under Section 9.1 WRESTLER shall bear responsibility for obtaining appropriate licenses for participating in wrestling exhibitions, PROMOTER shall be responsible for obtaining all other appropriate licenses to conduct professional wrestling exhibitions involving WRESTLER. If PROMOTER, at its discretion, agrees to assist WRESTLER in obtaining his/her licenses, WRESTLER shall reimburse PROMOTER for its fees and expenses incurred in connection therewith.

8.2        PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance as professional WRESTLER and his/her standing in the professional wrestling community, all of which shall benefit WRESTLER:

           (a)    In connection with WRESTLER's appearances and performance at Events staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion during a professional wrestling match;

           (b)    In connection with the production, distribution, and exploitation of the Programs, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication.

           (c)    In connection with any product or service licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing arrangements; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise or services. In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3        PROMOTER shall schedule the Events and book WRESTLER for the Events. In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event. PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time. If WRESTLER fails to appear as required without advance 24 hour notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then WRESTLER shall be subject to a fine to be determined by PROMOTER, in accordance with PROMOTER's costs for arranging the substitutions.

rev 1/5/96
Draft 6/18/96

8.4        Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fine shall not be imposed.   For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; a strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite his/her best efforts prohibits his/her performance or appearance at such Event.

## 9. WRESTLER'S OBLIGATIONS

9.1        WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2        WRESTLER shall be responsible for his/her own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

(a)        WRESTLER shall establish his/her own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining his/her physical fitness for wrestling. WRESTLER shall select his/her own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his/her own training facilities and equipment, whether by purchase, lease, license, or otherwise.

(b)        WRESTLER shall establish his/her own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning.  WRESTLER shall select his/her time for sleep, time for eating, and time for other activities.  WRESTLER shall select his/her own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs, which are also prohibited by PROMOTER's Drug Policy.

9.3        WRESTLER shall be responsible for supplying all wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event and WRESTLER shall bear all costs incurred in connection with his/her transportation to and from any such Events (except those transportation costs which are covered by PROMOTER's current Travel Policy), as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his/her appearance at such Events.

9.4        WRESTLER shall use his/her best efforts in employing his/her skills and abilities as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers required of wrestlers in a professional wrestling exhibition.

9.5        WRESTLER shall take such precautions as are appropriate to avoid any unreasonable risk of injury to other wrestlers in any and all Events.  These precautions shall include, without

rev 1/5/96
Draft 6/18/96

limitation, pre-match review of all wrestling moves and maneuvers with wrestling partners and opponents; and pre-match demonstration and/or practice with wrestling partners and opponents to insure familiarity with anticipated wrestling moves and maneuvers during a wrestling match. In the event of injury to WRESTLER, and/or his/her partners and opponents during a wrestling match, WRESTLER shall immediately signal partner, opponent and/or referees that it is time for the match to end; and WRESTLER shall finish the match forthwith so as to avoid aggravation of such injury.

9.6        WRESTLER shall use his/her best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of his/her wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction. Breach of this paragraph shall cause a forfeiture of any payment due WRESTLER, pursuant to Paragraph 7, shall terminate PROMOTER's guarantee as provided in Paragraph 1.2 above, as well as all other obligations of PROMOTER to WRESTLER hereunder, shall entitle PROMOTER to terminate this Agreement, but such breach shall not terminate PROMOTER's licenses and other rights under this Agreement.

9.7        WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, and to appear at and participate in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter created, including without limitation free, cable, pay cable, and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture), at times and places designated by PROMOTER. WRESTLER will receive no additional compensation in connection therewith.

9.8        WRESTLER acknowledges the right of PROMOTER to make decisions with respect to the preparation and exploitation of the Programs or the exercise of any other rights respecting Original and/or New Intellectual Property, and in this connection WRESTLER acknowledges and agrees that PROMOTER's decision with respect to any agreements disposing of the rights to the Original and/or New Intellectual Property are final, except as to WRESTLER's legal name, which PROMOTER may only dispose of upon WRESTLER's written consent. WRESTLER agrees to execute any agreements PROMOTER deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, PROMOTER is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact.

9.9        WRESTLER agrees to cooperate fully and in good faith with PROMOTER to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER'S appearance and/or performance in a professional wrestling match.

rev 1/5/96
Draft 6/18/96

9.10        WRESTLER shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, and affiliates and their respective officers, directors, employees, and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, proceedings or expenses, incurred by any of them by reason of WRESTLER'S breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. And, WRESTLER shall indemnify and defend PROMOTER against any and all claims arising out of WRESTLER'S acts, transactions and/or conduct within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where PROMOTER has scheduled Events at which WRESTLER is booked.

9.11        WRESTLER shall be responsible for payment of all his/her own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to his/her retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon his/her retirement from professional wrestling.

9.12        (a)  WRESTLER shall be responsible for his/her own commercial general liability insurance, workman's compensation insurance, professional liability insurance, as well as any excess liability insurance, as he/she deems appropriate to insure, indemnify and defend WRESTLER with respect to any and all claims arising out of his/her own acts, transactions, or conduct as a professional wrestler.

               (b)  WRESTLER acknowledges that the participation and activities required by WRESTLER in connection with his/her performance in a professional wrestling exhibition may be dangerous and may involve the risk of serious bodily injury. WRESTLER knowingly and freely assumes full responsibility for all such inherent risks as well as those due to the negligence of PROMOTER, other wrestlers or otherwise.

               (c)  WRESTLER hereby releases, waives and discharges PROMOTER from all liability to WRESTLER and covenants not to sue PROMOTER for any and all loss or damage on account of injury to the person or property or resulting in serious or permanent injury to WRESTLER or in WRESTLER'S death, whether caused by the negligence of the PROMOTER, other wrestlers or otherwise.

               (d)  WRESTLER acknowledges that the foregoing release, waiver and indemnity is intended to be as broad and inclusive as permitted by the law of the State, Province or Country in which the professional wrestling exhibition or Events are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full force and effect.

9.13        (a)  WRESTLER may at his/her election obtain health, life and/or disability insurance to provide benefits in the event of physical injury arising out of his/her professional activities; and WRESTLER acknowledges that PROMOTER shall not have any responsibility for such insurance or payment in the event of physical injury arising out of his/her professional activities.

rev 1/5/96
Draft 6/18/96

(b) In the event of physical injury arising out of WRESTLER'S professional activities, WRESTLER acknowledges that he/she is not entitled to any workman's compensation coverage or similar benefits for injury, disability, death or loss of wages; and WRESTLER shall make no claim against PROMOTER for such coverage or benefit.

9.14     WRESTLER shall act at all times with due regard to public morals and conventions during the term of this Agreement. If WRESTLER shall have committed or shall commit any act or do anything that is or shall be an offense or violation involving moral turpitude under Federal, state or local laws, or which brings him/her into public disrepute, contempt, scandal or ridicule, or which insults or offends the community or any employee, agent or affiliate of PROMOTER or which injures his/her reputation in PROMOTER's sole judgment, or diminishes the value of his/her professional wrestling services to the public or PROMOTER, then at the time of any such act, or any time after PROMOTER learns of any such act, PROMOTER shall have the right to fine WRESTLER in an amount to be determined by PROMOTER; and PROMOTER shall have the right to suspend and/or terminate this Agreement forthwith.

## 10. WARRANTY

10.1     WRESTLER represents, warrants, and agrees that he/she is free to enter into this Agreement and to grant the rights and licenses herein granted to PROMOTER; he/she has not heretofore entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of his/her obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are no pending claims or litigation affecting WRESTLER which would or might interfere with PROMOTER's full and complete exercise or enjoyment of any rights or licenses granted hereunder. Any exceptions to this Warranty are set forth in Schedule B, attached hereto.

10.2     (a)     WRESTLER represents, warrants and agrees that he/she is in sound mental and physical condition; that he/she is suffering from no disabilities that would impair or adversely affect his/her ability to perform professional wrestling services; and that he/she is free from the influence of illegal drugs or controlled substances, which can threaten his/her well being and pose a risk of injury to himself/herself or others. To insure compliance with this warranty, WRESTLER shall abide by PROMOTER's Drug Policy for wrestlers, as well as any and all amendments, additions, or modifications to the PROMOTER's drug policy implemented during the term of this Agreement and consents to the sampling and testing his/her urine in accordance with such policy. In addition, WRESTLER agrees to submit annually to a complete physical examination by a physician either selected or approved by PROMOTER. PROMOTER'S current Drug Policy, which WRESTLER acknowledges herewith receiving, is annexed hereto and incorporated herein.

rev 1/5/96
Draft 6/18/96

(b) (i)      In the event that WRESTLER is injured or otherwise becomes disabled during the term of this Agreement, and is thus unable to perform services under this Agreement for more than ninety (90) days from the date of this injury or disability, PROMOTER shall have the option to suspend or terminate this Agreement. Further, if this Agreement is suspended, and WRESTLER becomes able to perform all services as required by this Agreement, but later again becomes disabled, or is otherwise physically unable to perform as required hereunder, PROMOTER can immediately, at its option, suspend or terminate this Agreement.

(ii)      In the event that PROMOTER opts to suspend this Agreement, WRESTLER shall continue to receive any compensation due him under Section 7 during the period of suspension up to a maximum of ninety (90) days.   Continued suspension at the option of PROMOTER, shall be without pay to WRESTLER.  Upon certification by WRESTLER'S physician that he is fully recovered and capable of performing the services required under this Agreement, PROMOTER can reinstate this Agreement, and it will therefore continue to be of full force and effect, and its then current term may be extended at PROMOTER's sole option for a time period equal to the period of suspension but the Two Hundred Fifty Thousand ($250,000.00 US) Dollars remains the same for each contract year.

10.3      WRESTLER further represents, warrants and agrees that this Agreement supersedes all prior agreements between him and Titan, whether written or oral, and that he has been fully compensated, where applicable, under such prior agreement(s).



rev 1/5/96
Draft 6/18/96

## 11. EARLY TERMINATION

11.1        This Agreement may be terminated prior to the end of its term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either.

11.2        This Agreement will be terminated by WRESTLER's death during the term.

11.3        Upon the termination of this Agreement for any reason, including for breach as set forth in Paragraphs 12.1 through 12.4, the parties acknowledge and agree that PROMOTER shall own all right, title and interest in all Works, New Intellectual Property and any registrations thereof and PROMOTER shall have the exclusive right to sell or otherwise dispose of any materials, goods, merchandise or other items (i) produced during the term of this Agreement, incorporating any Original Intellectual Property, and (ii) whenever produced incorporating New Intellectual Property.

## 12. BREACH

12.1        In the event PROMOTER breaches this Agreement, WRESTLER may recover such actual direct damages as may be established in a Federal or State court in the State of Connecticut, as provided in Paragraph 13.8.

12.2        In the event WRESTLER breaches this Agreement, PROMOTER may in its sole discretion in addition to its rights under PROMOTER's drug policy, (i) terminate this Agreement; and/or (ii) suspend WRESTLER for a period of up to three  (3) months for each breach of the Agreement, provided that during each suspension period PROMOTER shall not book WRESTLER and WRESTLER may not appear or perform services relating to professional wrestling or sports entertainment throughout the world; and/or (iii) recover such actual direct damages as may be established in a court of law, as provided in Paragraph 13.8.  In addition, in the event of termination pursuant to this Paragraph, WRESTLER shall forfeit any future payments due pursuant to Paragraph 7.  WRESTLER shall not appear under, use, refer to or exploit in any manner, parenthetically or otherwise, the Original Intellectual Property for the remainder of the term and the New Intellectual Property forever.  Further, at PROMOTER's sole option, the term of this Agreement may be extended by the term of any suspension period, in whole or in part, with all other terms and conditions hereof remaining in full force and effect during such extended period.

12.3        The parties further agree that because of the special, unique, and extraordinary nature of the obligations of PROMOTER and WRESTLER respecting all rights and licenses concerning bookings, promoting, Programs, Events, Intellectual Property, which are the subject matter of this Agreement, WRESTLER's breach of this Agreement shall cause PROMOTER irreparable injury which cannot be adequately measured by monetary relief; as a consequence PROMOTER shall be entitled to injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default

-16-

hereunder and such injunction or equitable relief which shall be without prejudice to any other rights, remedies or damages which PROMOTER is legally entitled to obtain.

12.4        In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement, or otherwise, are expressly waived.

## 13. MISCELLANEOUS

13.1        Nothing contained in this Agreement shall be construed to constitute WRESTLER as a partner or joint venturer of PROMOTER, nor shall WRESTLER have any authority to bind PROMOTER in any respect.   WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints PROMOTER his/her attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing or the rights granted to PROMOTER herein.

13.2        This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are superseded by this Agreement.  There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3        This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

13.4        Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement, or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

13.5        PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted to and hereunder to any person, firm or corporation, and if any assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER shall have no further obligations to WRESTLER.   WRESTLER may not assign, transfer or delegate his/her rights or obligations hereunder and any attempt to do so shall be void.

13.6        Any notices required or desired hereunder shall be in writing and sent postage prepaid by certified mail, return receipt requested, or by prepaid telegram addressed as follows, or as the parties may hereafter in writing otherwise designate:

-17-

Titan Sports, Inc.
ATTENTION:
Linda E. McMahon
President
1241 E. Main Street
P.O. Box 3857
Stamford, Connecticut 06902

TO WRESTLER:

Owen Hart
2028 Sirocco Drive, S.W.,
Calgary, Alberta, Canada  T3H 2N9

The date of mailing shall be deemed to constitute the date of service of any such notice.

13.7        This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law.

13.8        In the event that there is any claim, dispute, or other matter in question arising out of or relating to this Agreement, the enforcement of any provisions therein, or breach of any provision thereof, it shall be submitted to the Federal, state or local courts, as appropriate, only in the State of Connecticut. This provision to submit all claims, disputes or matters in question to the Federal or state courts in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

## 14. CONFIDENTIALITY

14.1        Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, WRESTLER hereby acknowledges and agrees that further in consideration of PROMOTER'S entering into this Agreement, and continued Agreement, WRESTLER shall not, at any time during this Agreement, or after the termination of this Agreement for any reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit for WRESTLER for any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with PROMOTER and/or regarding PROMOTER, its employees, independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns.  Included in the foregoing, by way of illustration only and not limitation, are such items as reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards

-18-                                    rev 1/5/96
Draft 6/18/96

or ideas, information regarding any contractual relationships maintained by PROMOTER and/or the terms thereof, and/or any and all information regarding WRESTLERS engaged by PROMOTER.

14.2     WRESTLER acknowledges and agrees that his/her agreement to be bound by the terms hereof is a material condition of PROMOTER'S willingness to use and continue to use his/her services.  Other than as may be required by applicable law, government order or regulation; or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers, directors, employees or agents will do so either.

        All of the terms and conditions of any Addenda or Schedules are incorporated herein by reference and made a part hereof.

        IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

        TITAN SPORTS, INC.

By: _____
        Linda E. McMahon
        President

        OWEN HART_____
        WRESTLER's legal name

        _____
        WRESTLER's signature and title,
        if a professional corporation

-19-

STATE OF CONNECTICUT )
                                              ) ss: *Stamford*
COUNTY OF FAIRFIELD          )

On *July 9, 1996* ~~July (End)~~ 1996, before me *Elizabeth M DiFabio* personally came Linda E. McMahon, the President of Titan Sports, Inc., to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that she is a duly authorized corporate officer of Titan Sports, Inc., and that she executed the same on behalf of said company.

WITNESS my hand and notarial seal this *9* day of *July*, 1996.

*Elizabeth M DiFabio*
Notary Public

My commission expires:                ELIZABETH M. DIFABIO
                                       NOTARY PUBLIC, STATE OF CONNECTICUT
                                       MY COMMISSION EXPIRES
                                       AUGUST 31, 1999

*PROVINCE OF ALBERTA*
~~STATE OF~~ *CANADA*            )
                                              ) ss:
COUNTY OF_____          )

I, *ALI JOMAA*, a Notary Public for said ~~County and State~~ *PROVINCE*, do hereby certify that Owen Hart personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his/her free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this *1* day of *JULY*, 1996.

Notary Public

My commission expires:_____          ALI S. JOMAA
*at the Pleasure of the Attorney General*                 Barrister & Solicitor
*of Alberta.*

-20-                                          rev 1/5/96
                                              Draft 6/18/96

SCHEDULE A
ORIGINAL INTELLECTUAL PROPERTY

rev 1/5/96
Draft 6/18/96

SCHEDULE B
EXCEPTIONS TO WARRANTY
PENDING CONTRACTS/CLAIMS/LITIGATION WHICH MAY INTERFERE OR
CONFLICT WITH WRESTLER'S PERFORMANCE AND/OR GRANT OF RIGHTS

-22-

rev 1/5/96
Draft 6/18/96

**TITAN SPORTS, INC. TALENT TRAVEL POLICY** effective 2/27/96

Titan Sports will provide airline tickets in your legal name from your home to a location for the start of a tour, and a return ticket to your home at the completion of a tour, and any necessary tickets during a given tour.   These tickets are usually issued at the T.V. tapings, or may be sent to your home when necessary.   Once given to you, the tickets become your sole responsibility until they are either used for the purpose for which they were issued, or until they are returned to Titan for credit.  **AIRLINE TICKETS ARE THE SAME AS CASH.**   You need to adjust your thinking to regard your ticket as **YOUR CASH** until such time as they are used for the purpose for which they were intended.

Talent Relations will notify Travel Strategies of each incident where we have a "no show" or a "substitution" for a booking for which an airline ticket was issued and was not used. This information will become part of the individual's record with Travel Strategies, and each week Travel Strategies will provide this office with a listing of outstanding, unused tickets.  It is your obligation to return any unused tickets including tickets that are marked "non-refundable" if they are not used as issued.  They should be given to any Event Director (or other appropriate office personnel) the next day you are booked.  Under no circumstances should tickets be mailed to the office.  If three weeks pass and you have failed to return your unused tickets, a deduction will appear on your paycheck for the amount of the unused ticket.

If a ticket is lost or stolen, you should immediately report this information to Travel Strategies (203) 359-5440.  A "lost ticket claim" will be filed on your behalf.  You are responsible for the fee for filing this claim.  Any refund ultimately received will be credited back to you since you will be charged for this ticket during the claim process until it is either located and returned for refund or the status is resolved.

You should be reminded that any ticket not used for the purpose for which it was issued, which is subsequently used for any other purpose (i.e. applied to first class upgrade or for other travel use) will show up on the "lost ticket claim" as a used ticket for which there is no refund for credit.  Since you will be charged for the value of this "unused" ticket if it is not returned for refund credit, you will in essence be **USING YOUR OWN MONEY** if this ticket is applied for any other purpose.

In the event of an injury or personal problem (or any other reason that would cause you to leave the tour to return home) you are NOT to use other unused tickets or ongoing tickets to apply to your travel home.  The proper procedure in the event of an emergency is as follows:

1. Purchase your ticket home using your cash or credit card, for which you will be reimbursed by Titan Sports.

2. Have the Event Director purchase the ticket for you.

3. Call the office (or J.J. Dillon at home (203) 762-9879 outside normal business hours) to have a pre-paid ticket issued, which you can pick up at the airport prior to departure.

I repeat, under no circumstances should you use any other tickets to apply to the cost of your ticket home in an emergency situation.  We greatly appreciate the cooperation of everyone with this matter.

"Frequent Flyer" mileage and awards accrued from airline tickets provided by Titan Sports for business travel remain your property under the current Titan Travel Policy.  If you have any questions or comments, please feel free to call me.

I hereby acknowledge receipt and agree to the above terms:

_____        _____
Signature                                                   Date

44



**WORLD WRESTLING FEDERATION®**

EDWARD L. KAUFMAN
Vice President and General Counsel

November 18, 1997                    Via Overnight Courier

Mr. Owen Hart
2028 Sirocco Drive, S.W.
Calgary, Alberta  Canada  T3H 2N9

Re:    Titan Sports, Inc. d/b/a World Wrestling Federation ("Promoter") -w-
Owen Hart  ("Wrestler")

Dear Owen:

Reference is hereby made to that certain Booking Contract between the parties dated
July 1, 1996 ("Agreement").  For good and valuable consideration, the receipt and
sufficiency of which are hereby acknowledged, the parties have agreed to amend the
Agreement as follows ("First Amendment"):

*(At wrestler's option and discretion) may be OH — Jn*

1.    Paragraph 6.1 of the Agreement is hereby amended to extend the initial
term of the Agreement for an additional one (1) year term, through and including June
30, 2002.

2.    Paragraph 7.1 of  the Agreement is hereby amended to increase the
minimum amount of compensation due Wrestler during each year of the Agreement to
Four Hundred Thousand United States Dollars ($400,000.00).

3.    Add a new Paragraph 8.5 as follows:  "8.5 PROMOTER agrees to treat
WRESTLER during the term of the Agreement in substantially the same manner as
PROMOTER has in the past.  Should there be a substantial change during the term of
the Agreement in the manner in which PROMOTER treats WRESTLER, WRESTLER
shall be entitled to terminate this Agreement upon ninety  (90) days written notice to
PROMOTER."

4.    All terms not defined herein shall have the same meaning given them in
the Agreement.  Except as expressly or by necessary implication modified hereby, the
terms and conditions of the Agreement are hereby ratified and confirmed without
limitation or exception and shall remain in full force and effect.

TITAN TOWER
1241 East Main Street
Post Office Box 3857
Stamford, CT 06902
Phone:203 352 8786
Fax:  203 353 0236

F:\users\legal2\winword\OHart

® Registered Trademark of Titan Sports, Inc.

Please confirm your acceptance of this First Amendment as set forth above by signing before a notary in the space provided below on each of the enclosed two (2) copies and return them to me. One fully executed copy will be returned to you for your files. Thank you in advance for your prompt attention to this matter.

Very truly yours,

*Edward J. Kaufman*

Edward L. Kaufman

ELK:emd
Enclosures
cc:     Vince McMahon
        Linda McMahon
        Jim Ross
        Bruce Prichard
        Liz DiFabio
        Beth Zazza
ACCEPTED AND AGREED:

OWEN HART                                TITAN SPORTS, INC.

By: _____             By: _____
        Owen Hart                            Jim Ross
                                             Senior Vice President of Talent Relations
                                             and Wrestling Administration
Date: _Nov 20/07_                        Date: _11/26/97_


STATE OF                         )
                                 ) ss:
COUNTY OF                        )

                                                              PROVINCE.
        I, _ALI   JOMAA_, a Notary Public for said County and ~~State~~, do hereby certify that Owen Hart personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

        WITNESS my hand and notarial seal this _20_ day of _November_, 1997.

My commission expires: _AT   PLEASURE_        _____
                _OF   ATTORNEY_                      Notary Public
                _GENERAL OF_
F:\users\legal2\winword\OHart   _ALBELTA._          ALI S. JOMAA
                                                    Barrister & Solicitor

® Registered Trademark of TitanSports, Inc.

STATE OF CONNECTICUT          )
                             ) ss: Stamford
COUNTY OF FAIRFIELD           )

On _Nov. 26_____ 1997, before me _____ personally
came Jim Ross, Senior Vice President of Talent Relations and Wrestling Administration of
Titan Sports, Inc., to me known, and known to me to be the individual described in, and who
executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate
officer of Titan Sports, Inc., and that he executed the same on behalf of said Company.

WITNESS my hand and notarial seal this _26th_ day of _Nov_, 1997.

_____
                Notary Public

My commission expires: _5/31/2001_

® Registered Trademark of TitanSports, Inc.



**Hand Delivered**

January 11, 1998

Mr. Owen Hart
2028 Sirocco Drive S.W.
Calgary, Alberta, Canada  T3H 2N9

Re:   **Titan Sports, Inc. d/b/a World Wrestling Federation ("Titan") -w-
Owen Hart/Booking Contract Name Amendment**

Dear Mr. Hart:

Reference is hereby made to that certain Booking Contract between the parties entered into and effective as of July 1, 1996 and First Amendment dated November 18, 1997 (collectively "Agreement") in full force and effect as of the date hereof.  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties have agreed to amend the Agreement as follows ("Second Amendment"):

1.      At the time you began performing services for Titan,  the character name of "Blue Blazer" had not been established.  Subsequent to that date, Titan created and you have assumed such character name and image.  Notwithstanding termination of the Agreement for any reason, you hereby agree to assign and relinquish to Titan any and all claims of ownership and/or goodwill that may be acquired at any time now or in the future to and from such character name and image.

2.      All terms not defined herein shall have the same meaning given them in the Agreement. Except as expressly or by necessary implication modified hereby, the terms and conditions of the Agreement are hereby ratified and confirmed without limitation or exception and shall remain in full force and effect.

Please confirm your acceptance of this Second Amendment as set forth above by signing and notarizing in the space provided on each of the enclosed two (2) copies and return them to me.  One (1) fully executed copy will be returned to you for your files.  Thank you in advance for your prompt attention to this matter.

Very truly yours,

/s/

C. Scott Amann
Associate Counsel

cc:     Jim Ross
        Liz DiFabio

ACCEPTED AND AGREED:

OWEN HART

By: _____
        Owen Hart

Date: ___11|9|99___


TITAN SPORTS, INC.

By: _____
        Jim Ross
        Senior Vice President of Talent Relations
        and Wrestling Administration

Date: ___1|14|99___

F:\USER\SU\Legal Affairs\Amendments\Hart Owen name amnd.doc
01/06/99

STATE OF _____          )
                               ) ss:
COUNTY OF _____         )

    I am a Notary Public for said County and State, do hereby certify that Owen Hart personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this _11th_ day of _January_, 1999.

My commission expires: _____

JANET A. CUNNINGHAM
Notary Public, State of Texas
My Commission Expires 02-04-01

_Janet A. Cunningham_
Notary Public

STATE OF CONNECTICUT          )
                               ) ss:  Stamford
COUNTY OF FAIRFIELD            )

    On _January 14_, 1999, before me personally came Jim Ross, Senior Vice President of Talent Relations and Wrestling Administration of Titan Sports, Inc., to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of Titan Sports, Inc., and that he executed the same on behalf of said Company.

WITNESS my hand and notarial seal this _14th_ day of _January_, 1999.

_Karen Shapiro_
Notary Public

My commission expires: _____

KAREN SHAPIRO
NOTARY PUBLIC, STATE OF CT
MY COMMISSION EXPIRES SEP. 30, 2003

F:\USERS\U.egal Affairs\Amendments\Hart Owen name amnd.doc
01/06/99

©1998 Titan Sports, Inc.