UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

MARTHA HART                     :  No. 3:10CV-975 (SRU)
                                :  915 Lafayette Boulevard
            vs.                 :  Bridgeport, Connecticut
                                :
                                :  November 16, 2012
WORLD WRESTLING ENTERTAINMENT,  :
INC., ET AL                     :

- - - - - - - - - - - - - - - - x


MOTION HEARING


B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

    FOR THE PLAINTIFF:

        NIXON PEABODY
            100 Summer Street
            Boston, Massachusetts  02110
        BY:  GREGG A. RUBENSTEIN, ESQ.
             ARTHUR L. PRESSMAN, ESQ.

    FOR THE DEFENDANTS:

        K&L GATES, LLP
            Henry W. Oliver Building
            535 Smithfield Street
            Pittsburgh, Pennsylvania  15222-2312
        BY:  JERRY S. MCDEVITT, ESQ.
             CURTIS B. KRASIK, ESQ.

        DAY PITNEY LLP
            One Canterbury Green
            Stamford, Connecticut  06901
        BY:  JONATHAN B. TROPP, ESQ.

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917)703-0761

```
 1                    (2:10 O'CLOCK, P. M.)

 2              THE COURT:  Good afternoon.  We're here once

 3    again in Hart v. World Wrestling Entertainment.

 4              Could I have appearances, please?

 5              MR. RUBENSTEIN:  Greg Rubenstein for Nixon

 6    Peabody, Your Honor, for the plaintiff.  With me is Arthur

 7    Pressman and Ronaldo Rauseo-Ricupero.

 8              MR. McDEVITT:  Jerry McDevitt for World

 9    Wrestling Entertainment, with Curtis Krasik and Jonathan

10    Tropp.

11              THE COURT:  Okay, thank you.

12              All right.  Let me jump in here with some

13    questions first.  Feel free to be seated, if you would

14    like.

15              Mr. Rubenstein, I was a little surprised to see

16    the allegation that "Owen Hart" was not Owen Hart's ring

17    name.  Let me try and pin you down, because I understood

18    that you had admitted that he wrestled under the name Owen

19    Hart.

20              MR. RUBENSTEIN:  He did, Your Honor.

21              THE COURT:  Okay.  Well, if he wrestled under

22    the name Owen Hart -- and just to be clear, that's the

23    name that showed up on promotions for his wrestling

24    matches, be it TV advertising or posters or whatever; he

25    was marketed as Owen Hart.
```

```
1              MR. RUBENSTEIN:  Yes, he was, Your Honor.

2              THE COURT:  Not as some other ring name.

3              MR. RUBENSTEIN:  He, in fact, was marketed by at

4    least one other ring name while wrestling, but I think

5    it's fair to say he was primarily marketed under the name

6    Owen Hart.

7              THE COURT:  Throughout the time he was under

8    contract with WWE slash Titan?

9              MR. RUBENSTEIN:  That is correct, Your Honor.

10             THE COURT:  Okay.  Well, isn't Owen Hart the

11   distinctive and identifying indicia used by or associated

12   with the wrestler's performance in the business of

13   professional wrestling?

14             MR. RUBENSTEIN:  We don't believe that it is,

15   Your Honor, as defined in the booking agreement.

16             THE COURT:  Why not?

17             MR. RUBENSTEIN:  Because the booking agreement

18   takes that general term, distinctive and identifying

19   criteria, indicia, and then gives examples of what the

20   kinds are.  And in the definition of original intellectual

21   property, it recognizes as a distinct category something

22   called legal name.

23             THE COURT:  Correct.

24             MR. RUBENSTEIN:  And that definition, that

25   bucket of goods does not appear in new intellectual
```

1    property.

2              THE COURT:  Right.

3              MR. RUBENSTEIN:  And, therefore, it is our

4    position that it is not what was entitled, is not what the

5    parties intended to be included within the category of

6    intellectual property that is described and defined as new

7    intellectual property.

8              THE COURT:  Right.  Well, here's the problem, I

9    think, with that argument, and tell me how you respond.

10   When the wrestler comes to enter into the contract, the

11   organization has to be able to use his legal name.  The

12   Blue Blazer is Owen Hart.  And they give an interview,

13   who's the Blue Blazer?  They have to be able to say it's

14   Owen Hart, right?  And they don't have the right to do

15   that unless, unless he uses that name, right?

16             MR. RUBENSTEIN:  They would certainly have a

17   right to do that while he's under contract, Your Honor,

18   because the way that the booking agreement works is that

19   while under contract, WWE -- excuse me -- has an

20   assignment almost as broad as the rights it has to new

21   intellectual property, use all original intellectual

22   property while Owen is under contract.

23             So, certainly, while he is wrestling and while

24   he is performing under the name Owen Hart, the WWE has the

25   right to say "Come see Owen Hart" because that specific

1    right is granted to them under the grant of original

2    intellectual property rights while under contract.

3         THE COURT:  Except he didn't grant them any

4    original intellectual property rights.  He left Schedule A

5    blank, so he didn't grant them that.  So he doesn't --

6    they don't get it that way.  They get it because he used

7    it.  That's how everybody knew this wrestler was Owen

8    Hart.  And when he uses it, not having granted it, when he

9    uses it as his identifying indicia, it becomes new

10   intellectual property.

11        Doesn't mean that he can't use his legal name to

12   do whatever he has to do, rent an apartment or buy a car

13   or whatever, but it means that they can use it to the, to

14   the extent that that's how he was identified in the

15   wrestler's performances.

16        MR. RUBENSTEIN:  We disagree, Your Honor,

17   because the way that the contract actually reads is he

18   would not be permitted to use his legal name to rent an

19   apartment or do anything else, because once it falls into

20   the category of new intellectual property, WWE owns it,

21   lock, stock and barrel.  There are no exceptions.  It

22   doesn't say we own it for the purposes of promoting USA

23   Wrestler.  It simply says we own it.

24        And, in fact, as we point out in our brief, this

25   leads to what we believe is an absurd result.  It means

1   that Owen would not be allowed to wrestle under the name

2   Owen Hart after the termination of the agreement.

3                THE COURT:  Well, that is correct.  Because, had

4   he wanted to do that, he had to list it as original

5   intellectual property in Schedule A.  He could have.

6                In other words, the agreement set out a

7   procedure by which he could protect himself from exactly

8   what you're talking about.  But not having done that, yes,

9   WWE can require him to use some other name when wrestling

10  after this agreement is over.

11               MR. RUBENSTEIN:  The only response, quite

12  frankly, I can give Your Honor is we believe that is an

13  absurd result under the law and that he needn't list his

14  legal name in Schedule A because there was no doubt as to

15  what that legal name was.

16               What Your Honor is suggesting is a bit of a

17  Catch 22.  We all know what in fact his legal name was,

18  and we include that in the definition of original

19  intellectual property, has legal name.  By not including

20  it in the definition of new intellectual property, because

21  that term does not appear in the definition of new

22  intellectual property, it means that --

23               THE COURT:  Right.

24               MR. RUBENSTEIN:  -- it really comes superfluous.

25               THE COURT:  No, no, here's the deal.  If they

1    said -- the reason they said "legal name" in original

2    intellectual property is to allow him to protect it, so

3    that after he stops wrestling for WWE, should he want to

4    wrestle under his legal name, all he has to do is list it

5    and he's protected himself and he can go off and he can

6    wrestle as Owen Hart.  But, not having done that, he has,

7    for purposes of wrestling, given up the name Owen Hart.

8    He's going to have to wrestle as somebody else.

9              MR. RUBENSTEIN:  All I can say, Your Honor, we

10   don't believe that is correct under the reading of the

11   contract or, in fact, how the parties interpreted it,

12   given that other wrestlers, and we sought discovery to

13   this extent, we think other wrestlers at the time -- we

14   give the name of Jeff Garrett -- was permitted to go and

15   wrestle under his legal name after leaving his contract

16   with the WWE.

17              If, in fact, as we --

18              THE COURT:  That's because there was a lack of

19   enforcement.  It doesn't mean they don't have the right.

20   You don't have to enforce every right you have.  I mean --

21              MR. RUBENSTEIN:  It may be because of a lack of

22   enforcement, Your Honor.  It may also be because the

23   parties in fact understood that they couldn't stop someone

24   from wrestling under their legal name.  I think both are

25   equally plausible.

1          THE COURT:  Well, I guess I disagree.  The whole

2     idea here is WWE, with respect to new intellectual

3     property, is creating an image.  It's creating promotion.

4     It is spending tons of money so that a particular name,

5     ring name, moniker, whatever you want to say, becomes

6     associated with WWE.  That's the whole idea.

7          And so, to say that, notwithstanding limitations

8     on the use of new intellectual property, somebody could

9     just go off and use the name that they've had created and

10    promoted by WWE, seems to me to undercut the value of this

11    agreement.

12         I mean why would a -- why would a promoter

13    promote under those circumstances?

14         MR. RUBENSTEIN:  Because a promoter fairly

15    recognizes that there are certain things to which it

16    cannot gain rights, and one of those things would be a

17    person's legal name.  A person has a right to hold

18    themselves out and make a living using their legal name,

19    as opposed to a made-up name.  A made-up name is

20    different.  A legal name is something that is given at

21    birth, they choose legally, and in fact --

22         THE COURT:  But you're arguing the converse of

23    what we're worried about here.  You're saying some public

24    policy prevents the enforcement of a covenant not to use a

25    ring name if it's actually your legal name.  The issue we

1   have is not whether that applies, the issue we have is

2   does WWE retain rights in the name that was created as new

3   intellectual property, and it's got to mean that.  It's

4   got to mean even if a wrestler can go off and wrestle in

5   their own name, WWE, having developed that name as a

6   wrestler associated with them, has the right to continue

7   using that name, for example, in videos.

8           MR. RUBENSTEIN:  I don't think that's what it

9   means, Your Honor.  I think -- in fact, if that's what it

10  meant, it would have been simple to include the term

11  "legal name" within the definition of new intellectual

12  property.  And, in fact, by leaving it -- if that were the

13  correct interpretation, Your Honor, we wouldn't need the

14  term "legal name" because ring name would encompass both.

15  We wouldn't need it at all because, in fact --

16          THE COURT:  It does.

17          MR. RUBENSTEIN:  But, Your Honor, original

18  intellectual property allows, allowed, Owen Hart to

19  reserve previous names he had wrestled under there too.

20  He had the right to list ring names also.  So it's not

21  that ring names is somehow -- if that's all it meant, we

22  wouldn't need legal name at all.  We'd just have to say

23  "ring name" in the original intellectual property.  He

24  would list Owen Hart, as I understand what Your Honor is

25  saying, because that's the name he wrestled with in the

1  ring, but instead, it lists this distinct group of names.

2  One, legal name.

3       THE COURT:  But it doesn't say "only," it says

4  "including."

5       MR. RUBENSTEIN:  Including, but yet, including

6  does not include legal name under new intellectual

7  property.

8       THE COURT:  I'm obviously aware of that but I

9  don't think it matters.  The point of listing it in old

10  intellectual property is to allow him to protect himself.

11       MR. RUBENSTEIN:  How would that give him any

12  more allowance to protect himself than the presence of

13  ring name in the original intellectual property?

14       THE COURT:  It's telling him, look, you have to

15  list your name in Schedule A if you ever want to wrestle

16  under your name again.  If you want to have the rights to

17  go back and do that, list your name.  It's a notice

18  provision.  It's -- they don't want to get caught up with

19  the very argument you're making now.  Oh, well, the legal

20  name isn't the ring name; the ring name is something else,

21  so anybody who wrestles with their legal name isn't bound

22  by these provisions.  So they are saying, wait a minute,

23  we want to be very clear with you, the first thing we list

24  there is legal name.  Don't fail to include your legal

25  name on Schedule A if you want to wrestle under your legal

```
 1    name.  I mean I don't see how it can mean anything else.
 2              MR. RUBENSTEIN:  I have to respectfully
 3    disagree, Your Honor.
 4              THE COURT:  Well, okay.  Well, let's go back to
 5    where we started.  Owen Hart, the words "Owen Hart" were
 6    distinctive and identifying indicia used by Owen Hart or
 7    associated with him in the performance of the business of
 8    professional wrestling under the terms of this agreement,
 9    right?
10              MR. RUBENSTEIN:  They were, Your Honor.  But
11    they were not, the terms "Owen Hart" did not meet the
12    definitional of, that you just put out, were not
13    distinctive and -- I want to get it right --
14              THE COURT:  Distinctive and identifying indicia.
15              MR. RUBENSTEIN:  Distinctive and identify
16    indicia, because at least under new intellectual property,
17    distinctive and identifying indicia does not include legal
18    name.
19              I mean I don't -- I certainly appreciate what it
20    is that I believe Your Honor is heading towards.  There is
21    not, quite frankly, much more I can offer besides saying
22    the fact that -- that's a general term.  We then give
23    examples of what comprised that general term.
24              In original intellectual property, the example
25    includes legal name.  In new intellectual property, the
```

1    example specifically does not include legal name.  So

2    that, while the general terms may be -- in fact, are

3    identical, the specific components of that are different.

4    If they were meant to be identical, having put a

5    definition in a set of examples one paragraph above,

6    clearly WWE knew how to put that in the following

7    paragraph.  There must be some intent.  There must be some

8    reason why it's not there.

9         THE COURT:  Well, I think I just gave you a

10   reason.

11        MR. RUBENSTEIN:  I think you did, Your Honor.

12        THE COURT:  It wouldn't be in either place but

13   for the need to give notice that old intellectual property

14   includes, and you're going to lose the right to use, your

15   own name unless you write it down.

16        It's not necessary in the second one because any

17   distinctive and identifying indicia that he used, as

18   associated with his performance as a wrestler, any

19   indicia -- name, likeness, costumes, personality, voice,

20   everything -- anything you did as a wrestler, we get, we

21   get to keep.

22        MR. RUBENSTEIN:  It would seem to create a

23   conflict though, Your Honor, in the sense that if he used

24   -- let's say he wrote Owen Hart down on Schedule A and

25   then continued to use it anew under this contract.

1          THE COURT:  Right.

2          MR. RUBENSTEIN:  Arguably he used it during the

3     contract.

4          THE COURT:  Right.

5          MR. RUBENSTEIN:  It would be new intellectual

6     property to which WWE had the exclusive rights.  It owned

7     it entirely.

8          THE COURT:  Right.  Here, the only conflict

9     would be when he goes out and he's left WWE and he wants

10    to wrestle for some other W, then there's no doubt that he

11    can use that name.

12         MR. RUBENSTEIN:  And presumably then, under your

13    interpretation, WWE could create a new wrestler just named

14    Owen Hart, different person.

15         THE COURT:  Absolutely, same as Batman or the

16    Hulk.

17         MR. RUBENSTEIN:  All of which are fictitious,

18    made-up names.

19         THE COURT:  Or Tom Jones.  It be could be Tom

20    Jones, it could be John Doe, it could be anything that's

21    used to identify the wrestler.  That's the point.  Who's

22    wrestling today?  It's John Doe.  Oh, I love John Doe,

23    he's great.  I saw him wrestle, you know, Jane Smith.

24    John Doe is who's being promoted by WWE.  That's who WWE

25    is paying money to create an image for, so if whoever the

```
1    wrestler is that they call John Doe, whether that's his
2    real name or his made-up moniker, and he wants to leave
3    and go wrestle under that name, he's going to be prevented
4    from doing that.  Why?  Because he was created, that
5    association was created through the promotion under this
6    agreement.  I just don't see how it can be interpreted
7    otherwise.  I really don't.
8              MR. RUBENSTEIN:  I understand what Your Honor is
9    saying.  Honestly -- we read it differently.  That's all I
10   can offer at this point.
11             THE COURT:  Okay.  All right.  Well, I think
12   this name issue obviously is critical to almost, almost
13   all the causes of action.
14             MR. RUBENSTEIN:  I would agree.  We tried to
15   make that pretty clear upfront.  We haven't suggested
16   otherwise.
17             THE COURT:  Mr. McDevitt, you want to be heard?
18             MR. McDEVITT:  Just to buttress some of your
19   remarks, Your Honor, in their introduction to their brief
20   they admit essentially that they are out of court.  They
21   say, and again, it's interesting that they talk now about
22   new intellectual property.  If we can go back and
23   understand the document basis of their claim here is that
24   the WWE and Owen Hart specifically agreed not to use his
25   name.  That's what they said.  The only basis for that is
```

by claiming that it was original intellectual property,
which there isn't any.  There's no other contractual basis
upon which to say that the WWE ever agreed not to use
Owen's name and they even admit that.

In their introduction, they say the primary
issue before the Court is whether Owen's legal name is in
a category of property to which WWE contractually
relinquished all rights after determination of the booking
agreement, i.e., old intellectual property.  They called
it old; I assume they mean the original.

And then they actually say if Owen's legal name
is not old intellectual property, then Hart's claims for
wrongful use of Owen's legal name fails in all but one of
the claims against the McMahons individually also.  You
already decided that.  You decided that as clearly as you
can be, and it's correct.

THE COURT:  Well, you know, I don't think it's
quite as clear as it should have been.  I went back and
looked.  I was very surprised when I saw the amended
complaint and --

MR. McDEVITT:  I agree with Your Honor.

THE COURT:  -- I was not fully consistent in
what I said.  I probably gave them hope that they could
plead around this, but --

MR. McDEVITT:  Here's where I think -- I think,

1   as I read your opinion and I think it's absolutely

2   correct, on the money, on the original intellectual

3   property.  No, the only conclusion you can make, you're

4   absolutely right, is has to be listed on there for there

5   to be any --

6            THE COURT:  Well, that part is right.

7            MR. McDEVITT:  Once you do away with the idea,

8   that's the only source that they ever said was the source

9   of a contractual agreement not to use his name.  So, the

10  new intellectual property provisions don't have any kind

11  of reversionary claim to them at all.  There're exactly

12  what Your Honor said they are.  If you use it when you're

13  performing, it's new intellectual property.

14            And the reason for that is real simple.  We get

15  to use the name that he used in his performances to

16  describe the performances that they agree that we are

17  allowed to use and copyright and publish and everything

18  else.  They've even agree we're allowed to use it within

19  the work.

20            We're being sued, quite frankly, Your Honor,

21  because we truthfully used the man's name to describe who

22  he is in the DVD.  That's all this case has ever been on

23  that front.  And, quite frankly, Your Honor, at this

24  point, given your rulings and given what you just said,

25  and I concur with you 100 percent in your interpretation,

1   they went on in this brief to say that if, if you agree

2   that there's no original intellectual property, which

3   you've already found that there isn't, and there isn't,

4   then all the other claims go out the window except for

5   what they say is copyright, royalty right and publicity

6   claims.  I agree that the royalty claim is in the case for

7   reasons we discussed the last time.

8         When you issued your opinion the last time, Your

9   Honor, with respect to the right of publicity claim and

10  the copyright claim, which are the only two claims left,

11  in addition to the royalty claim, with respect to the

12  copyright claim, just to refresh Your Honor's

13  recollection, the copyright claim centered on two

14  photographs, two family photographs that appeared for a

15  fleeting moment in the documentary about the Hart family.

16        Mrs. Hart didn't own those copyrights at the

17  time of the publication.  She originally made a copyright

18  claim, since abandoned it, that she owned a registered

19  copyright of his life story, which is just nonsense.  You

20  can't own a registered copyright in a life story and she

21  didn't.

22        So she substituted a copyright claim and was

23  claiming her own damages.  And, as we pointed out, she

24  stands in the shoes of the assignor, the photographer who

25  took the pictures, for purposes of her copyright claim.

1    She can only assert the damages that the photograph had.

2    That's all she has.

3              THE COURT:  Right.

4              MR. McDEVITT:  And she was told that, and told

5    to amended her complaint, and she didn't.  She's still

6    claiming Martha Hart's been damaged.  It's not Martha

7    Hart's damages in the copyright claim.

8              THE COURT:  Well, that's not a bar to the claim,

9    because, you know, copyright, you've got statutory damages

10   at a minimum.

11             MR. McDEVITT:  She doesn't, Your Honor, and for

12   a simple reason.  She didn't register the copyright.  And

13   without infringement, you can't get statutory damages.

14             THE COURT:  All right.

15             MR. McDEVITT:  And so she doesn't have that.

16   The only thing that would be available would be the

17   photography, the assignor's actual damages, if has any.

18   There's been none pled.

19             THE COURT:  Well, but look, they have an

20   assignment.  The assignment is a very broad assignment.

21   The cases seem to recognize that when you get an

22   assignment for past infringements as well as future, the

23   assignee can sue for past infringements.

24             MR. McDEVITT:  The assignor's got damages, I

25   agree with you.

1        THE COURT:  Well, but the measure of damages

2    though, that will be a jury charge issue.  It doesn't bar

3    the claim.  She has --

4        MR. McDEVITT:  But she hasn't alleged any

5    damages by the assignor.  That's who she stands in the

6    shoes of.  Her complaint, Your Honor, if you look at the

7    amended complaint that she filed -- if you give me a

8    second here.

9        THE COURT:  Well, okay --

10        MR. McDEVITT:  She ends it by -- the only

11    allegation of damages that is made is she says --

12        THE COURT:  I think this is a weak claim, I

13    think it's a small money claim, but I think it's a valid

14    claim.

15        MR. McDEVITT:  It's put in there to burden our

16    right to speak to, the only reason it's there.  That's why

17    she went and did it.

18        THE COURT:  Well --

19        MR. McDEVITT:  But all she says about copyright

20    damages, Your Honor, is -- in paragraph 91, it's only

21    allegation about damages for violation of copyright.

22    "Martha Hart has been substantially harmed by this

23    violation of her copyright."  That's -- her damages are

24    irrelevant.  It's the assignor's damages and she hasn't

25    pled that the assignor's had any actual damages, right to

1    statutory damages or anything else.  I submit this is a

2    deficient claim on its face.

3           The other claim that you ordered her to replead,

4    if she could, involved the same two photographs that were

5    what Your Honor referred to in the prior proceeding as

6    nonwrestling photographs, which we have the absolute right

7    to copyright and all the rest of that.

8           Those two photographs, you gave her leave to

9    amend to state a publicity right claim around that, if she

10   could.  She has not even attempted.  It's back to that we

11   used her name and it's all about we used his name, we used

12   his name.  That's exactly what is not at issue so she

13   isn't even trying to fashion a claim to try to show that

14   the estate in some way has been -- there's been a

15   publicity rights violation with respect to those two

16   photographs that are truthful depictions of Owen and her

17   family.

18          And we submit, Your Honor, and I know the last

19   time you indicated with respect to that film, that there

20   might be some issue as to whether it was commercial speech

21   or whatnot -- and I don't know if Your Honor has had a

22   chance to look at that film.

23          THE COURT:  I have not seen the entirety of that

24   film.

25          MR. McDEVITT:  I would submit to Your Honor and

1    if you watch the documentary that we are talking about --

2              THE COURT:  It's nine hours, right?

3              MR. McDEVITT:  Pardon me, Your Honor?

4              THE COURT:  Isn't it nine hours?

5              MR. McDEVITT:  No, no -- I think the total of

6    all the tapes in the box are.

7              THE COURT:  For some reason I thought they were

8    nine hours and I decided, guess what, I don't need to

9    watch nine hours to look for two little photos.

10             MR. McDEVITT:  That's a discrete -- it's the

11   story about the Hart family.

12             THE COURT:  Sure.

13             MR. McDEVITT:  It's like a 60 Minutes piece, and

14   if you watch that, Your Honor, and you can honestly say

15   that if that thing aired on 60 Minutes, you would tolerate

16   some challenge from a First Amendment standpoint, then

17   we'll proceed, but I don't think you honestly could.

18             It's a documentary.  It's about the Hart family.

19   It's the brothers and sisters telling their version of

20   their life in the Hart family.  It has a fleeting picture,

21   a truthful picture, of Owen with his family.  There's no

22   dispute that's him and his family.  That's what we're

23   talking about.

24             That is absolutely protected by the First

25   Amendment.  That's the reason she tried to stop it.  If

1    you look back in history, Your Honor, she tried to enjoin

2    the publication of that.  Her anti-First Amendment motive

3    can't be seriously disputed.

4          And I would urge Your Honor, the whole

5    commercial speech thing, it can only be commercial speech

6    if it doesn't do anything more than propose a commercial

7    transaction.  If you watch that, it's a documentary.  I

8    don't think you can come away from that thinking anything

9    other than that's protected speech.

10         THE COURT:  Well, I think that the simple

11   approach to this is whether those, the use of those

12   photographs would be, you know, highly offensive to a

13   reasonable person or not.  Isn't that a fundamental

14   element of the claim?  I mean, you know --

15         MR. McDEVITT:  I don't know how -- I mean

16   honestly, Your Honor, I know personal feelings and all the

17   rest of that kind of stuff, but it's her and it's her

18   family.  It was part of Owen's life.  What Ms. Hart

19   unfortunately seems to believe is that she has some

20   exclusive right, and she says it repeatedly, some

21   exclusive right to control the use of the man's name and

22   no one can use his name without her permission.

23         Under her theory of law, Your Honor, I couldn't,

24   if I wanted to -- if I wanted to write a book about the

25   Owen Hart case and use his name, and put a picture on the

1   front, I couldn't do it because I don't have her

2   permission.  Now, we all know that's not the law.  We all

3   know I don't need her permission to write a book about

4   Owen Hart or to tell a documentary about Owen Hart.

5   Nobody can.  He's a public figure, was a public figure.

6   Anybody who wants to write about him can write about him

7   and put a documentary together.  That's what the company

8   did, and we've been punished for it ever since by these

9   lawsuits.

10          And I would ask Your Honor -- I agree with

11  everything you've said about the original intellectual

12  property.  I tried to think if there's any other

13  conclusion anyone can reach.  You actually said in there,

14  I think the salient point is that there's nowhere in the

15  contract that we ever agreed that we wouldn't use his

16  name.  That's the bottom line.  That's the end of that

17  story.

18          They have no basis upon which to say we can't

19  use the man's name, other than this ginned up claim that

20  it was somehow original intellectual property based on the

21  selective editing of that provision, which the Court has

22  already found is against the plain language of the

23  agreement, which we concur with.

24          So I respectfully think, Your Honor, and I've

25  always thought this, that at best this case is a royalties

1    case that she's asserted for the first time after ten

2    years of silence, and these two claims about publicity and

3    this copyright, both of which center around those two

4    family photos, which she didn't even own at the time we

5    published this thing.  She went out and bought them so she

6    could bring this copyright case.

7            And she hasn't pled that we did any damage to

8    the assignor.  She's trying to claim it somehow damaged

9    her.  She can't substitute her version of she thinks she

10   was somehow damaged for the assignor, and that's what

11   she's trying to do in the complaint.

12           And under the publicity claim, Your Honor, as I

13   said, I think if you -- she didn't even try to state a

14   claim to somehow show that publication of those two

15   photographs in that documentary in some way violated some

16   right of publicity that is otherwise not protected by the

17   First Amendment.

18           And I, again, respectfully suggest, Your Honor,

19   I think if I remember correctly, I think that

20   documentary -- and don't hold me to this -- I think it was

21   something about an hour, hour and-a-half to watch it, but

22   you really don't have to watch long to see what it is.

23   It's a 60 Minute piece.  If it aired on 60 Minutes, you

24   wouldn't think twice about it.  It's the same thing.

25           Thank you, Your Honor.

1          THE COURT:  All right, thank you.

2          I'm wondering whether we ought to just run

3     through the claims and see if we can figure out where

4     things stand.

5          I think I've made myself pretty clear in terms

6     of the original intellectual property and new intellectual

7     property issue.  So I think that WWE did have the right to

8     use Owen, the name Owen Hart.  They didn't have the right

9     to use presumably the full name, that is using his middle

10    name which arguably is his legal name, because he didn't

11    wrestle under that.  But he wrestled under the name Owen

12    Hart.  That's almost exclusively the name he wrestled

13    under, is my understanding, and I think that, that issue

14    is clear from the language of the contract.

15         So, as we go through this, it seems to me that

16    the first count, which is unauthorized use of original

17    intellectual property, fails because, as I've noted,

18    previously held, there is no original intellectual

19    property.

20         Did you want to be heard further on that?

21         MR. RUBENSTEIN:  I think Your Honor's been

22    pretty clear on that.

23         THE COURT:  All right.  So then we've got Count

24    Two.  I haven't really heard your position on copyright

25    infringement.

1              MR. RUBENSTEIN:  Your Honor, not surprising

2     perhaps, we disagree with Mr. McDevitt's analysis.  I

3     think we pled a copyright claim.  There is a registered

4     copyright.  We attached the assignment.  It specifically

5     provides for the assignment of past, present and future

6     infringement.

7              The best that I hear -- what I hear is an

8     argument about semantics, and perhaps Your Honor

9     disagrees, but what I hear, I believe, and it's always

10    been my understanding that as an assignee, they are now

11    her damages.  She is the owner of all of those rights.

12    She owns right, title and interest to all claims for past,

13    present and future damages.

14             And so, they are her damages now, because they

15    have been -- whatever past damages there were have been

16    assigned to her.  If this is really a question of changing

17    the language of the complaint to say Ms. Hart, as

18    assignee, seeks the damages that first occurred when they

19    were owned by the original person but now is assigned to

20    her, we can replead it, but I dare say it's really form

21    over substance.

22             THE COURT:  Yes, I actually agree.  I think the

23    copyright claim survives the motion to dismiss.  It seems

24    to me that --

25             MR. McDEVITT:  One aspect of that, Your Honor,

1    they've also sued Mr. McMahon personally on that.  You

2    made some findings on that and I don't know why the

3    McMahons are in the case personally.

4         THE COURT:  Well, yeah --

5         MR. McDEVITT:  I mean she didn't even own the

6    copyright at the time this stuff comes out.  How can Vince

7    McMahon be sued for that?

8         MR. RUBENSTEIN:  With due respect, Your Honor,

9    Vince McMahon can be sued because the Copyright Act allows

10   a claim for vicarious liability.  We set out the test in

11   our papers.

12        THE COURT:  Yes, but the problem with vicarious

13   liability with respect to Mr. McMahon is this.  All you

14   really said is he was the CEO.  He had the right to

15   supervise anybody at the company and the company did this

16   and, therefore, he's personally liable.  I don't

17   understand that that's the basis -- that that is a basis

18   for vicarious liability.

19        For vicarious liability, you have to have a

20   direct supervisor.  You have to allege he was responsible

21   for Tom Jones' inclusion of these photos in the video.

22        The way this comes up is, you know, the police,

23   the police sergeant knows that the police officer beats

24   people up and doesn't do anything about it.  Or the shift

25   supervisor knows that one of his drivers is a drunk driver

1    and doesn't do anything about it.  That's how you get

2    vicarious liability.  There's a direct involvement by the

3    individual who's being held vicariously liable.  You

4    haven't alleged direct involvement.  You're saying he had

5    the right and ability to supervise and control, not that

6    he did supervise and control.

7            MR. RUBENSTEIN:  If I may, Your Honor?

8            THE COURT:  Yes.

9            MR. RUBENSTEIN:  I think, respectfully, that

10   you're confusing two different kinds of vicarious

11   liability.  The test that you described with respect to

12   the supervisor who knows that the sergeant beats everybody

13   else is what I would refer to as common law vicarious

14   liability.

15           Vicarious liability is actually statutorily set

16   under the copyright and has a much lower bar for vicarious

17   liability to attach under the Copyright Act than the

18   common law test you just directed.  We cited to those

19   cases in our brief and I would urge you to at least look

20   at those cases because we believe they set a different

21   standard.

22           I would also add to that, Your Honor, what we

23   have done, we've pled them mostly quite frankly with

24   respect to the claims against Vince, but we do have

25   evidence that Mr. McMahon in fact knew of and played a

1   role in the creation of the video where the copyrighted

2   photos occur.  We've have two emails from discovery that

3   suggest he was not simply a person at the top of the chain

4   but was actually aware of this particular video, questions

5   were being asked of him about this particular video --

6          THE COURT:  Was he aware that the person

7   preparing the video had a propensity to violate

8   copyrights?  Doesn't he have to show that?

9          MR. RUBENSTEIN:  I don't believe that he does,

10  Your Honor.

11         THE COURT:  Mr. McDevitt, you want to weigh in

12  on this one?

13         MR. McDEVITT:  What you previously said as part

14  of the reason why you're dismissing it is because they

15  hadn't alleged that Vince was involved in the production

16  or sale of the Hart and Soul video.  They have not alleged

17  that Vince McMahon, number one, knew that this copyright

18  was owned by anybody, was included in it, or that we

19  didn't have permission to use it -- which, by the way, I

20  know that it goes beyond the pleadings -- we did.

21         But, in any event, there's just no basis to drag

22  the CEO of the company in for violating a copyright she

23  didn't even own at the time this was thing was published.

24  How could he possibly be said to have done something

25  harmful to her?  He couldn't have called her and asked her

1  for permission if he wanted to because she didn't own the

2  copyright.

3           And I would rely on the rest of what we put in

4  our brief, Your Honor.  We briefed the requirements as to

5  what -- to impose individual liability on Mr. McMahon for

6  use of those two photos, and they don't come close to it

7  or even allege it.

8           (Pause)

9           MR. McDEVITT:  I think Your Honor has gone

10 through -- if I may respectfully, unless --

11          THE COURT:  Just a minute.  I'm trying to find

12 the discussion of vicarious liability and copyright

13 infringement.

14          MR. McDEVITT:  In our brief or in your opinion,

15 Your Honor?

16          THE COURT:  He said in his brief he cited cases

17 about vicarious liability and the copyright.  I don't see

18 that.  That's what I'm looking for.

19          The copyright claim discussion is on page 39.

20          (Pause)

21          THE COURT:  I got it, page 48.

22          MR. RUBENSTEIN:  Sorry I didn't get there

23 quicker, Your Honor.

24          THE COURT:  All right.  I'm going to go ahead

25 and take a look at those cases.

1              MR. McDEVITT:  Your Honor, we distinguished

2     their cases at Footnote 13 of Document 100.  And if I may

3     just make one final comment, the only allegation about

4     Vince McMahon in this copyright count, they don't allege

5     he had actual knowledge anywhere that these two

6     photographs were being used.  What they do allege about

7     Mr. McMahon is only in paragraph 88.  That says he had the

8     right and ability to supervise and control production of

9     the video, and I direct -- that's it.

10             MR. RUBENSTEIN:  Actually that's not correct,

11    Your Honor.  Paragraph 66 has the allegation that

12    Mr. McMahon had personal knowledge of the content of the

13    April 2010 video entitled Hart and Soul.

14             MR. McDEVITT:  That doesn't allege he had

15    personal knowledge of the photographs in the Hart and

16    Soul.

17             THE COURT:  All right, I understand the

18    arguments.  I'll take a look at that.

19             Okay.  So we were going through the claims.  So

20    that's Count One.  I'm going to allow the general

21    copyright infringement claim against WWE.  I will reserve

22    decision on whether that claim can be brought against

23    Mr. McMahon.

24             Negligent supervision is common law, the common

25    law problem that we talked about a moment ago, and I think

1    there, you have to allege more than you have.

2            MR. McDEVITT:  Well, Your Honor, if I may, again

3    taken at face value from the brief, I think they could say

4    this is one of the claims that falls by the wayside --

5            THE COURT:  Because of the --

6            MR. McDEVITT:  Right.

7            MR. RUBENSTEIN:  Agreed, Your Honor.

8            THE COURT:  Fair enough.  So I'm going to

9    dismiss Count Three.

10           Count Four, is the, I think, the heart of the

11   claim, failure to pay royalties.  I don't think there's

12   even an argument that that should be dismissed.

13           Count Five, the unjust enrichment again I think

14   turns on the use of the name.

15           MR. RUBENSTEIN:  I agree, Your Honor.

16           THE COURT:  That is dismissed.  Count Six,

17   violation of CUTPA, same thing.

18           MR. RUBENSTEIN:  Not entirely, Your Honor.

19           THE COURT:  Okay.

20           MR. RUBENSTEIN:  At least as to the breach of

21   copyright, would be a violation of a CUTPA claim also, so

22   if you allow the copyright claim to go forward, I think

23   there would be a potential basis for a CUTPA violation

24   also.

25           MR. McDEVITT:  They are now changing their own

1    position from what they said in their own brief.  And the

2    count doesn't say anything like that.

3           The pled count that they've pled says they

4    misappropriated original intellectual property, breached

5    their contractual obligations and profited from -- that's

6    the allegations made here, and their own brief says that

7    that count goes if you don't buy the idea that legal name

8    was original intellectual property.  So they are just

9    switching gears again.

10          And, by the way, Your Honor, the Copyright Act

11   would preempt CUTPA anyway.

12          THE COURT:  Well, I would have thought so, and

13   there is no, there's no claim -- there's no allegation of

14   a copyright violation being the basis for the CUTPA

15   violation, so I'm going to dismiss Count Six.

16          Count Seven, right to publicity and

17   appropriation of likeness, I think this goes out as well

18   as a result of the intellectual property ruling.  This

19   claim, as I understand it, has to do with his name and his

20   likeness in the DVD distinct from the copyright issue.

21          MR. McDEVITT:  That is correct, Your Honor.

22          MR. RUBENSTEIN:  If you could give me just one

23   moment, Your Honor.

24          THE COURT:  Sure.

25          (Pause)

```
 1              MR. RUBENSTEIN:  In Your Honor's earlier
 2    decision, when you were addressing the right of publicity
 3    appropriation of likeness claim, you did hold that the
 4    motion to dismiss was denied as to this claim with respect
 5    to the photos.
 6              THE COURT:  But -- you're talking about the two
 7    Christmas card photos?
 8              MR. RUBENSTEIN:  Yes.
 9              THE COURT:  How can you have a copyright claim?
10    Why doesn't the copyright claim preempt that common law?
11              MR. RUBENSTEIN:  I believe that it would.
12              THE COURT:  Yes, so if I said that in my earlier
13    remarks, I think I just missed that.  So I'm going to
14    dismiss Count Seven.
15              Count Eight is the false association claim,
16    which again I think fails as a result of the determination
17    regarding the contract.  Do you disagree?
18              MR. RUBENSTEIN:  I don't, Your Honor.
19              THE COURT:  All right.  count Eight is
20    dismissed.
21              I do want to just comment also about the
22    argument the defendants make about the release is not an
23    argument that I find persuasive.  I don't think the
24    release --
25              MR. McDEVITT:  I'm sorry, Your Honor, I could
```

1    not hear.

2            THE COURT:  I don't find your argument

3    concerning the release to be persuasive.  That is, I don't

4    think that this, any of these claims that we're talking

5    about now arise in connection with or are related to the

6    death of Owen Hart.

7            MR. McDEVITT:  Given your finding that there's

8    no liability, there's no need to address it anyway.

9            THE COURT:  All right, fair enough.

10           All right.  Have we done all of the claims other

11   than the copyright claim against Mr. McMahon?

12           MR. McDEVITT:  Yes.

13           MR. RUBENSTEIN:  Yes, Your Honor.

14           THE COURT:  All right.  So I will issue a short

15   decision on that soon.

16           Anything else?  Anyone want to be heard further

17   on the motion to dismiss?

18           (No response.)

19           THE COURT:  All right, let's take up the motion

20   to strike and the motion for sanctions.

21           I'm going to cut to the chase.  I don't like

22   motions to strike.  I don't give complaints to juries, so

23   the prejudice, if any, from the types of allegations that

24   remain I think is extremely minimal.  It's the fact they

25   were filed.  Anybody that wants to, can look at that

1    complaint, whether I strike those provisions or not.  And

2    so I just don't think it's worth our time frankly to go

3    through and decide which of the allegations that are

4    complained of should be stricken and which should not.

5    So, it's my intention to deny the motion to strike.

6         But I want to give you a chance to be heard if

7    you'd like to.  Mr. McDevitt.

8         MR. McDEVITT:  Your Honor, I'm just trying to

9    quickly calculate what claims are left.  The royalty

10   claim -- copyright claim on two photos.  I mean I don't

11   know how much of that stuff would even be pertinent to

12   this anyway, so I mean -- I understand your point that the

13   complaint doesn't go to the jury.  I just -- and I'm

14   thinking about the Owen Hart Foundation and whether that

15   would even come into play in the two claims that remain.

16   I don't see how it would.

17        THE COURT:  No, I don't think it would, but --

18        MR. McDEVITT:  You know, I just don't want to --

19   because it's in the complaint, somehow that means it's

20   relevant or, you know, that kind of thing.

21        THE COURT:  I don't see it as relevant but -- I

22   also don't see that we need to strike it, frankly.  So

23   when somebody wants to do discovery about the foundation,

24   the person opposing that can probably say it's beyond the

25   scope of the remaining claims.  I don't think it matters

1    if there's a meaningless allegation left in the complaint.

2           MR. McDEVITT:  Actually the other side, Your

3    Honor, I didn't see how anything about the Owen Hart

4    Foundation was relevant to the claims that were originally

5    pled.  I certainly don't see how anything about it

6    could be -- I don't want her coming in and talking about

7    the Owen Hart Foundation in a contract royalties case,

8    that kind of stuff.  So we can deal with that as it comes

9    up.

10           THE COURT:  Stand up, say "Objection," I'll say

11    "Sustained."  I mean if the plaintiff wants to submit a

12    further revised complaint reflecting these rulings, I'm

13    not going to prohibit that, but I'll also not going to

14    require that.  So it's up to you.

15           We have the motion for sanctions.  I don't like

16    motions for sanctions frankly, and I think the principal

17    basis on which the motion for sanctions rests is

18    attributable to some ambiguity in my original order, and,

19    as a result, I don't think it's appropriate to sanction

20    plaintiff's counsel.

21           So, again, I'm happy to hear you.

22           MR. McDEVITT:  I don't want to waste your time,

23    Judge, if that's the way you feel.

24           THE COURT:  All right.  Okay, so I'm going to

25    deny both the motion to strike and the motion for

1    sanctions.

2         Where are we in this case in terms of discovery,

3    in terms of trial readiness, et cetera?

4         MR. RUBENSTEIN:  I'll take a shot at it, Your

5    Honor.  After we appeared here twice before, both sides

6    have exchanged initial written discovery requests.  I

7    think it's fair to say that both sides had significant

8    concerns with the other's responses, but as a practical

9    matter -- I think from our perspective as a practical

10   matter, we put those to the side and we're waiting to see

11   whatever ultimately may happen with the claims that were

12   here.

13        So I would characterize it in saying we're

14   really at the initial stages of discovery.  We're at the

15   initial stages of discovery.  I think we need to go back

16   and look at the concerns that we have with their

17   responses.  I dare say they want to go back and look at

18   the concerns they had with our responses and take a look

19   at, in light of what Your Honor decided today, how

20   significant they are.  Go back and see where we're going.

21        THE COURT:  All right.  Any counter comment?

22        MR. McDEVITT:  There has been some attentive

23   discovery.  We gave them, I think, Your Honor -- don't

24   hold me to this because it's been a while, but I think we

25   already have given them the information that they would

1    need to determine what royalties they think are due.  I

2    can verify that.

3           There's been no depositions taken and frankly,

4    since your original order, there hasn't been any

5    discovery, I don't think that's been done because, as

6    counsel has indicated, we've been waiting to see what you

7    do with this attempt to reject issues in the case.

8           So we'll have to basically go back and look at

9    the discovery -- it's much more narrower now in light of

10   what the Court's rulings are -- and start discovery

11   basically.

12          THE COURT:  Let me suggest to both sides, before

13   you start discovery and start spending a ton of money on

14   discovery, that this ought to be a very simple case to

15   settle.  It's -- at this point it's essentially a royalty

16   case.

17          MR. McDEVITT:  We agree, we've always agreed.

18          THE COURT:  Everybody can look at the royalty

19   rate.  Presumably we can get somebody to certify numbers

20   of items sold and everybody can do the math.

21          So -- and I assume that the defendant is willing

22   to pay the royalties it owes, so if there's some

23   discrepancy in the amount that's owed and the amount

24   that's been paid, presumably they'll get a checkbook out

25   and the case will be done.

1              MR. McDEVITT:  We wanted that to happen a long

2       time ago.

3              THE COURT:  Well, fair enough, but I mean why

4       can't it happen now is what I'm saying.

5              MR. McDEVITT:  Because they were insisting --

6       well, I'm not saying it can't happen now, Your Honor.  It

7       should happen now.

8              THE COURT:  It should happen now.

9              MR. McDEVITT:  But I don't think that's what

10      you're going to get from them.  But we'll see.

11             MR. RUBENSTEIN:  I don't disagree with what Your

12      Honor said.  There is one, there is one thing, I guess,

13      with which I disagree, and that is there's a question of

14      how far back do we look?

15             Your Honor at one point had said, well, six

16      years for a contract claim.  We have pled a fraudulent

17      concealment.  I think that's a legal issue.  Doesn't mean

18      that reasonable minds can't split the difference and try

19      to come up with an agreement.  But fundamentally I agree

20      with you.  I think that there's a legal question as to

21      what's the window.

22             THE COURT:  Well, okay.  Why doesn't WWE provide

23      information necessary to calculate royalties --

24             MR. McDEVITT:  I think we've already --

25             THE COURT:  For the full period.

1          MR. McDEVITT:  I don't remember what we gave

2     them off the top of my head.  Maybe he does.  I know we

3     have given them royalty information.  It may well be that

4     it only went back six years because that is the statute of

5     limitations.  I don't know if we have ten years, but if we

6     have ten years, I mean --

7          THE COURT:  Give them ten years and then we can

8     argue about it.

9          MR. McDEVITT:  I don't have a problem giving it.

10          THE COURT:  If it's a small number -- it would

11     not surprise me, I don't know how long this DVD is but it

12     would not surprise me that six lawyers sitting in court

13     for two hours at whatever your rates are are going to be

14     approaching the difference between six years and ten years

15     of royalties on this film.  I mean how much do each of you

16     want to require the other to pound sand, I guess is really

17     what I'm asking.

18          MR. McDEVITT:  Your Honor, I have to defend my

19     client in one sense here.  Please keep in mind that in the

20     last ten years, Ms. Hart has never had any communications

21     of any kind with us.  She never called us up and said --

22          THE COURT:  I understand that.

23          MR. McDEVITT:  We would have talked to her, and

24     I repeatedly told them that from day one in this case.

25     It's a royalties case, for God's sake.

1          THE COURT:  Well, now it really is a royalty

2     claim, because that's where we are.  And so, look, if

3     everybody says we treated us badly or they didn't do this

4     and they didn't do that, and if you look in the rearview

5     mirror, then all you guys are going to make tons of money.

6          MR. McDEVITT:  Your Honor --

7          THE COURT:  But if you're both looking out for

8     your clients, then you ought to communicate quickly about

9     what's the, what is the worst case scenario?  What's the

10    best case for the plaintiff, what's the best case for the

11    defendant.  What is the range.  And let's figure out

12    whether this case can be resolved.

13          I got -- you know, a royalties case has got to

14    be one of the simplest cases to settle that are in the

15    public court system.  It's math.  There's an admitted

16    obligation, perhaps limited by a statute of limitations,

17    but there's an admitted obligation, there's a fixed

18    royalty rate, we can figure out what the sales were.  We

19    have six lawyers here on this.

20          MR. McDEVITT:  The only reason that hasn't

21    happened is they didn't want that to happen.

22          THE COURT:  Look, I'm sure they have the same

23    thing to say about you guys, but what I'm saying is here

24    we are today and here we are with a royalties case.  Can

25    we quickly get this done, is what I'm trying to figure

1    out.

2              MR. McDEVITT:  I don't think the problem will

3    come from my client, that's all I'm saying.

4              THE COURT:  So you'll supply what they need?

5              MR. McDEVITT:  I think they already have it but

6    they can verify that.

7              MR. RUBENSTEIN:  I don't think we do.

8              MR. McDEVITT:  If they don't have it -- it's

9    been a while.  I know we've given them financial

10   information, I just don't know how far back it goes.

11             THE COURT:  Fine.

12             MR. McDEVITT:  And I know they have a number.

13             MR. RUBENSTEIN:  Your Honor, we can get this

14   done.

15             MR. McDEVITT:  We'll pick it up, and if they're

16   not willing to talk -- we tried to have a mediation, it

17   didn't work.

18             THE COURT:  Well, things are simpler now, so

19   let's make an effort.  The two of you should communicate,

20   maybe before you leave this room, about what you need to

21   know in order to evaluate this case.

22             MR. McDEVITT:  Fine by us, Your Honor.

23             THE COURT:  And then find a way to get it to the

24   other side and let's make it happen.  I just -- I fear

25   that each of your clients is going to say, well, I could

1    have settled six months ago, but now that it's June of

2    2013 and I've paid you X hundred thousand dollars, I'm not

3    going to settled for Y.  And then we're just going to get

4    further and further apart.  The attorneys fees are going

5    to go drive us apart.

6          I'm sorry it look as long as it did to get us

7    where we are, but we are where we are.  But we're now at I

8    think a straightforward royalty case with a copyright

9    footnote, and you guys ought to be able to figure this

10   out.

11          MR. RUBENSTEIN:  Understood, Your Honor.

12          MR. McDEVITT:  I agree with Your Honor.

13          THE COURT:  All right.  Anything else we can

14   usefully do today?  Do we need to get a schedule in place

15   or anything?

16          MR. RUBENSTEIN:  I dare say I think we'll be

17   better off talking first, Your Honor.  I think we can come

18   back.

19          THE COURT:  Okay.  If you can't settle this in

20   the next six weeks, let's get a schedule in place for

21   discovery.

22          MR. McDEVITT:  That's fair, Your Honor.

23          THE COURT:  All right, good luck.  Thank you.

24          MR. McDEVITT:  Thank you, Your Honor.

25          MR. RUBENSTEIN:  Thank you, Your Honor.

1          THE COURT:  Stand in recess.

2          (Whereupon the above matter was adjourned at 3:10

3     o'clock, p. m.)

C E R T I F I C A T E


I, Susan E. Catucci, RMR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.



/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761